## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

```
————————————————————————————x
                                      :
KAPTAN DEMIR CELIK ENDUSTRISI VE      :
TICARET A.S.                          :
              Plaintiff,              :
                                      :        Court No. 22-00149
        v.                            :
                                      :
UNITED STATES,                        :
                                      :
              Defendant,              :
        and                           :
                                      :
REBAR TRADE ACTION COALITION, et al., :
                                      :
              Defendant-Intervenors.  :
————————————————————————————x
```

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), respectfully moves for judgment on the administrative record. For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Kaptan requests that the Court determine that the U.S. Department of Commerce's results in *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019,* 87 Fed. Reg. 21,640 (Apr. 12, 2022) and the accompanying Issues and Decision Memorandum is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

_/s/ Andrew T. Schutz_
Andrew T. Schutz
Jordan C. Kahn

1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: January 13, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

```
————————————————————————x
                                    :
KAPTAN DEMIR CELIK ENDUSTRISI VE    :
TICARET A.S.                        :
                 Plaintiff,         :
                                    :     Court No. 22-00149
          v.                        :
                                    :
UNITED STATES,                      :
                                    :
                 Defendant,         :
          and                       :
                                    :
REBAR TRADE ACTION COALITION, et al.,:
                                    :
                 Defendant-Intervenors. :
————————————————————————x
```

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), and upon all other papers and proceedings herein, the Court

ORDERS that Kaptan's Motion is granted; and further

FINDS that the contested results of the U.S. Department of Commerce ("Commerce") in *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019,* 87 Fed. Reg. 21,640 (Apr. 12, 2022) and the accompanying Issues and Decision Memorandum (collectively, "Final Results"), was not supported by substantial evidence on the record, and was otherwise not in accordance with law; and further

ORDERS that this matter is remanded to Commerce for reconsideration of the Final

Results in accordance with the decision of this Court.

SO ORDERED.

_____

Gary S. Katzman, Judge

Dated: _____, 2023
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| —————————————————————x | : | |
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | : | |
| Plaintiff, | : | |
| | : | Court No. 22-00149 |
| v. | : | |
| | : | |
| UNITED STATES, | : | **PUBLIC VERSION** |
| | : | |
| Defendant, | : | |
| and | : | |
| | : | |
| REBAR TRADE ACTION COALITION, *et al.*, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| —————————————————————x | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Andrew T. Schutz
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

*Counsel for Plaintiffs*

Dated: January 13, 2023

# TABLE OF CONTENTS

STATEMENT PURSANT TO RULE 56.2 ................................................................. 1

    A.    Administrative Decision Under Appeal ................................................. 1

    B.    Reasons For Contesting The Administrative Decision ...................... 1

    C.    Issues Presented And Summary Of Argument ................................... 1

        1.    Was Commerce's finding that Nur Gemicilik ve Tic. A.S. ("Nur") was a cross-owned input supplier pursuant to 19 C.F.R. § 351.525(b)(6)(iv) supported by substantial evidence and in accordance with the law? .......... 1

        2.    Was Commerce's calculation of the benefit for Kaptan's rent free land as a good for less than adequate remuneration ("LTAR") rather than as revenue foregone supported by substantial evidence and in accordance with the law? ....................................................................................... 2

        3.    In calculating the benefit for the land rent program pursuant to 19 C.F.R. § 351.511, was the Department's selection of an industrial rent benchmark without adjusting the benchmark to remove rent attributed to buildings rather than land only, supported by substantial evidence and in accordance with the law? ................................................................................. 3

        4.    Was Commerce's finding that the program on Exemptions from Bank and Insurance Transactions Tax ("BITT") on Foreign Exchange Transactions was countervailable supported by substantial evidence and in accordance with the law? .......................................................................... 4

STATEMENT OF FACTS ....................................................................................... 4

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT ............................................................................................................ 9

    A.    COMMERCE'S FINDING THAT NUR WAS A CROSS-OWNED INPUT SUPPLIER PURSUANT TO 19 C.F.R. § 351.525(B)(6)(IV) WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW ....................................................... 9

        1.    NUR DOES NOT SATISFY THE INPUT SUPPLIER ATTRIBUTION CRITERIA AS SET FORTH IN THE DEPARTMENT'S REGULATIONS, THE PREAMBLE, AND PRIOR COMMERCE CASES ......................................................... 9

        2.    COMMERCE'S PREVIOUS DETERMINATIONS THAT SCRAP CAN BE A PRIMARILY DEDICATED INPUT IN THESE PROCEEDINGS DOES NOT NECESSITATE A SIMILAR FINDING UNDER THE FACTS OF THIS CASE ........ 19

        3.    COMMERCE'S OTHER ARGUMENTS JUSTIFYING ITS DETERMINATION THAT NUR IS A CROSS-OWNED INPUT SUPPLIER ARE WITHOUT MERIT AND SHOULD BE DISREGARDED ............................................................ 21

i

**B.** **COMMERCE'S DETERMINATION FINDING NUR'S LAND RENT EXEMPTION COUNTERVAILABLE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ............................................................................... 24

    **1.** **COMMERCE'S CALCULATION OF THE BENEFIT FOR KAPTAN'S RENT FREE LAND AS A GOOD FOR LESS THAN ADEQUATE REMUNERATION RATHER THAN AS REVENUE FOREGONE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ................................ 24

        **a. Any Benefit from the Exemption from Payment Under the Land Use Agreement Must be Calculated as Revenue Foregone** ................................ 25

        **b. Nur's Land Use Agreement is a Lease as it Meets Every Element that Defines a Lease** ................................................................................... 27

        **c. Commerce Unlawfully Concluded that Nur's Land Use Agreement was a "Conditional Easement"** ........................................................................ 29

        **d. The Resort to a Benchmark in this Case was Unsupported by Record Evidence and Contrary to Law** ............................................................. 31

    **2.** **THE DEPARTMENT'S SELECTION OF AN INDUSTRIAL RENT BENCHMARK WITHOUT ADJUSTING THE BENCHMARK TO REMOVE RENT ATTRIBUTED TO BUILDING RATHER THAN LAND ONLY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ................................ 32

**C.** **COMMERCE'S DETERMINATION THAT EXEMPTIONS FROM BANK AND INSURANCE TRANSACTIONS TAX ("BITT") ON FOREIGN EXCHANGE TRANSACTIONS ARE SPECIFIC WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW** ........................................................................................... 38

**CONCLUSION** ............................................................................................................. 412

ii

# TABLE OF AUTHORITIES

**Cases**

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, Inc., 419 U.S. 281 (1974) ...................... 26

*Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ........................................... 37

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................................... 7

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .................................... 25

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ........................................... 7

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ...................................................................................................................... 18, 19

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .............................. 7

*Nucor v. United States,* 927 F.3d 1243 (Fed. Cir. 2019) ........................................................ 26, 27

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) .................................. 7

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) .................................................. 8

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) .................................................. 8

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ......................................... 37

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012) ................... 8

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ........... 26

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 C.I.T. 1003 (2013), as amended (July 19, 2013),................................................................................................................................... 33

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) .................................................................................................................................................. 37

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................................................... 7

19 U.S.C. § 1677(5)(D).......................................................................................................... passim

19 U.S.C. § 1677(5A)(D)........................................................................................................... 3, 37

19 U.S.C. § 1677f(i)(3)(B)............................................................................................................ 37

19 U.S.C. § 1677(5)(E)(iv) ................................................................................ 30, 32

19 C.F.R. § 351.509 ......................................................................................... 25, 30

19 C.F.R. § 351.510 ............................................................................................... 25

19 C.F.R. § 351.511 ........................................................................................ passim

19 C.F.R. § 351.525(b)(6)(iv) ......................................................................... passim

**Administrative Decisions**

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 2018, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ............................................................................ 12, 13, 21

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2018*, 85 Fed. Reg. 45,185 (Jul. 27, 2020) .............................................. 14

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38,361 (June 22, 2020) .... 14, 15, 21

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,342 (June 4, 2013) .............................. 30

*Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020) ................ 15, 16, 21

*Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021) .......................................... passim

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) .......................... passim

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed.Reg. 56,640 (Sept. 28, 2005) ................................................ 32

*Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) ..................... passim

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86 Fed. Reg. 511,516 (Jan. 6, 2021) ................................................................................... 4

*Laminated Woven Sacks From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 14,647 (April 11, 2019) .......................... 25

*Non-Oriented Electrical Steel From Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 61,602 (Oct. 14, 2014) ....................................... 25, 30

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Countervailing Duty Order,* 79 Fed. Reg. 65,926 (Nov. 6, 2014) ................................................................................. 3

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019,* 87 Fed. Reg. 21,640 (Apr. 12, 2022) ........................................................................................................................ 1

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind in Part; 2019,* 86 Fed. Reg. 69,009 (Dec. 6, 2021) ............................................................................................ 6

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 42,353 (July 14, 2020) ........................................................................................................... 17

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016,* 84 Fed. Reg. 36,051 (July 26, 2019)............................................................................................................. 18

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018,* 86 Fed. Reg. 53,279 (Sept. 27, 2021)................................................................................................................. 28

## Other Authorities

Black's Law Dictionary (10th Edition, 2020)................................................................ 27

Merriam-Webster.com Dictionary ........................................................................... 26, 27

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSANT TO RULE 56.2

### A.   ADMINISTRATIVE DECISION UNDER APPEAL

Kaptan seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") Final Results published in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019*, 87 Fed. Reg. 21,640 (Apr. 12, 2022). ("Final Results") (**PR 177**), and the accompanying Issues and Decision Memorandum "IDM") (**PR 176**) (collectively, "Final Results").

### B.   REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Kaptan's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.   ISSUES PRESENTED AND SUMMARY OF ARGUMENT

**1.**   **Was Commerce's finding that Nur Gemicilik ve Tic. A.S. ("Nur") was a cross-owned input supplier pursuant to 19 C.F.R. § 351.525(b)(6)(iv) supported by substantial evidence and in accordance with the law?**

**No.** The Department's Regulations, the *Preamble* to the CVD regulations, and multiple prior Department decisions require the Department to use the following framework when deciding whether to attribute subsidies received by an affiliated input supplier. The Department must (1) make its decision on a case-by-case basis depending on the particular input, the downstream product, and the production process; (2) consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in the case; and (3) determine whether it is reasonable to conclude that the purpose of the subsidy to that company would have

been to benefit the production of the downstream product. It is not reasonable to conclude based on the evidence on the record that the purpose of a subsidy to Nur, which is a shipbuilder, was to benefit Kaptan's commodity steel production. Therefore, the Department's finding that Nur was a cross-owned input supplier pursuant to 19 C.F.R. § 351.525(b)(6)(iv) was not supported by substantial evidence and in accordance with the law.

This issue is identical to the same issue raised in Kaptan's challenge of the Department's 2018 final results before this court in case number 21-565, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States.* A decision in that case should dictate the outcome of this issue in this case.

> **2.** **Was Commerce's calculation of the benefit for Kaptan's rent free land as a good for less than adequate remuneration ("LTAR") rather than as revenue foregone supported by substantial evidence and in accordance with the law?**

**No**. The record establishes that Nur used and occupied land for the development of a shipyard and that Nur entered into an agreement with the government, which owns the land, for a fixed term of 49 years and for an ascertainable charge over the term. The Department normally treats government assistance received in the form of wholly exempted rental amounts as revenue foregone under 19 U.S.C. § 1677(5)(D)(ii), rather than as a good for LTAR. The benefit is the exempted amount from the contract or a listed government rental price rather than a comparison to a rental "benchmark" the Department creates for the purposes of the proceeding. The Department's conclusion in the Final Results that this land agreement was not a lease within the common definition and use of that term, and that conditionality for the waiver of the charges somehow renders any benefit under this agreement as a financial contribution in the form of the provision of goods under 19 U.S.C. § 1677(5)(D)(iii) was unsupported by record evidence and contrary to consistent agency practice and law.

2

This issue is identical to the same issue raised in Kaptan's challenge of the Department's 2018 final results before this court in case number 21-565, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*.  A decision in that case should dictate the outcome of this issue in this case.

3.  **In calculating the benefit for the land rent program pursuant to 19 C.F.R. § 351.511, was the Department's selection of an industrial rent benchmark without adjusting the benchmark to remove rent attributed to buildings rather than land only, supported by substantial evidence and in accordance with the law?**

**No**. If the Court finds that Commerce appropriately treated the benefit for Kaptan's land as an LTAR program rather than a revenue foregone program, the Court should nonetheless remand this issue back to Commerce to adjust the benchmark calculation to remove rent attributed to buildings rather than land only, in accordance with the Department's Regulations and prior case law. The Department did not sufficiently justify its dismissal of the three alternatives Kaptan provided in its administrative case brief to adjust the benchmark. The Department's failure to adjust the benchmark was unsupported by substantial evidence and not in accordance with the law.

This issue is identical to the same issue raised in Kaptan's challenge of the Department's 2018 final results before this court in case number 21-565, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*.  A decision in that case should instructive to the outcome in this case as there are some minor factual differences on the record here.

4. **Was Commerce's finding that the program on Exemptions from Bank and Insurance Transactions Tax ("BITT") on Foreign Exchange Transactions was countervailable supported by substantial evidence and in accordance with the law?**

**No**. Commerce's finding that the BITT exemption was countervailable was unsupported by substantial evidence and not in accordance with the law. Under 19 U.S.C. § 1677(5A)(D)(i), a program is specific if the legislation providing the subsidy expressly limits access to the subsidy to an enterprise or industry. The BITT exemption, however, is neither limited to an enterprise or industry, because it applies to all foreign exchange sales and thus already limits the universe of potential applicable companies since only companies that have foreign exchange sales must pay BITT. Moreover, the program is not limited to certain companies, because any enterprise with an industrial registry certificate is subject to a 0% BITT rate and that certificate can be obtained by any industrial establishment.

This issue is not before the court in case number 21-565, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States.*

**STATEMENT OF FACTS**

The Department issued a countervailing duty order on rebar from Turkey on November 6, 2014. *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Countervailing Duty Order*, 79 Fed. Reg. 65,926 (Nov. 6, 2014) ("Order"). On January 6, 2021, the Department initiated the fifth administrative review on the Order, covering countervailable subsidy benefits received by Kaptan and other Turkish producers/exporters during the period of review ("POR") of January 1, 2019, through December 31, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 511,516 (Jan. 6, 2021).

The Department selected Kaptan and Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S. (collectively "Colakoglu") as the two mandatory respondents in the review and

issued countervailing duty questionnaires to each company (and the Government of Turkey), accordingly. (**PR 22**). On March 30, 2021, Kaptan timely filed a response to the Affiliation Section of the Department's initial CVD questionnaire. As required, Kaptan identified all of its affiliates including the affiliates the company believed fell within the meaning of cross-owned input suppliers under 19 C.F.R. § 351.525(b)(6)(iv). Kaptan Affiliation Response at 5 (March 30, 2021) (**PR 29/CR 6**). One of the affiliates identified was Nur, a shipbuilding company that sold scrap it generated from its ship building production to Kaptan, which Kaptan used as an input in its production of both subject and non-subject merchandise. *Id*. The generation of scrap is a very insignificant portion of Nur's business and the amount of scrap Kaptan purchased from Nur was extremely miniscule compared to the scrap Kaptan purchased from other sources:

| | Name of Major Input | Total Volume Purchased (tons) | Total Value Purchased (TL) | Percentage (by QTY) |
|---|---|---|---|---|
| Aset Madencilik San ve Tic. A.S. | Scrap | | | 0.001% |
| [          ] | Scrap | | | 24.98% |
| [          ] | Scrap | | | 0.12% |
| Martas Marmara Ereglisi Liman | Scrap | | | 0.03% |
| Nur Gemicilik | Scrap | | | 0.01% |
| Kaptan Geri Dönüşüm Teknolojileri | Scrap | | | 0.001% |
| Unaffiliated Suppliers | Scrap | | | 74.86% |
| **Total** | | | | |

*Id.* As a result, Kaptan stated that it should not be required to report the subsidies, if any, or provide a full questionnaire response for Nur as a "cross-owned input supplier" since the company's scrap production was not "primarily dedicated to the production of the downstream product" within the meaning of 19 C.F.R. § 351.525(b)(6)(iv). *Id.*

The Department issued a supplemental questionnaire to Kaptan's response to the Affiliation Section of the Department's initial CVD questionnaire on April 16, 2021, requiring Kaptan to provide each of its identified affiliates' total revenue and scrap sales during the POR. (**PR 38**). On April 22, 2021, Kaptan filed a timely response to the supplemental questionnaire reporting that Nur's scrap sales represented [      ] of Nur's total sales. Kaptan Supp. Affiliation Response at 1 (Apr. 22, 2021) (**PR 40/CR 8**).

On May 5, 2021, Kaptan provided the Department with a full initial CVD questionnaire response and reported that Nur possibly used certain alleged "Regional Development Subsidies." Specifically, Kaptan reported that Nur entered into a Lease and Investment agreement whereby Nur was permitted to use land rent free in exchange for meeting certain investment and employment criteria. Kaptan Initial CVD Questionnaire Response at 31-33 (May 6, 2021) (**PR 77/CR 42**).  Kaptan emphasized that this agreement was for "the use of the land only." *Id*. at 31.

On August 25, 2021, Kaptan provided a response to the Department's New Subsidy Allegation Questionnaire.  In this response, Kaptan indicated that Kaptan Demir used the program on Exemptions from bank and insurance transactions tax on foreign exchange transactions.  Kaptan New Subsidy Allegation Response at 1-4 (Aug. 25, 2021) (**PR 130/CR 109**).

On November 24, 2021, Kaptan submitted revised benchmark data which included rental rates for public lands reported by the MINISTRY OF ENVIRONMENT, CLIMATE AND URBANIZATION / Directorate General of National Property. Kaptan Benchmark Data – revised at 2 (Nov. 24, 2021) (**PR 146**).

On December 6, 2021, the Department published its Preliminary Results of the administrative review. *Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary*

6

*Results of Countervailing Duty Administrative Review and Intent to Rescind in Part; 2019*, 86 Fed. Reg. 69,009 (Dec. 6, 2021) ("Preliminary Results") (**PR 153**). In its Preliminary Results, the Department found that (1) Nur was a cross-owned input supplier of Kaptan within the meaning of 19 C.F.R. § 351.525(b)(6)(iv); (2) Nur's receipt of rent-free land represented a countervailable subsidy within the meaning of section 771(5) of the Act; (3) Nur's non-payment of rent resulted in a subsidy attributable to Kaptan at an *ad valorem* rate of 1.6%; and (4) Kaptan's use of the BITT Exemption resulted in a subsidy attributable to Kaptan at an *ad valorem* rate of 0.10%.

Kaptan filed its administrative case brief challenging certain decisions and finding the Department made in the Preliminary Results on January 13, 2022. (**PR 164/CR 119**). Specifically, Kaptan challenged (1) the Department's determination that Nur was a cross-owned input supplier under 19 C.F.R. § 351.525(b)(6)(iv); (2) the Department's determination to analyze this program as goods for less than adequate renumeration rather than revenue foregone; (3) the benchmark used to calculate the land benefit; and (4) the Department's determination that the BITT exemption was countervailable.

On April 12, 2022, the Department published its Final Results and assigned a final CVD rate of 1.75% to Kaptan. (**PR 177**). In the unpublished IDM accompanying the Department's Final Results, the Department rejected Kaptan's arguments with regard to (1) Nur's status as an input supplier, (2) that the Department should treat Nur's rent free land as revenue foregone rather than a good for LTAR, (3) benchmark adjustments, and (4) that the BITT exemption is not countervailable. (**PR 176**) (hereinafter "Final IDM").

Additional relevant facts are discussed under each of the arguments below.

## **STANDARD OF REVIEW**

This Court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (Ct. Int'l Trade 2012).

## ARGUMENT

**A.     COMMERCE'S FINDING THAT NUR WAS A CROSS-OWNED INPUT SUPPLIER PURSUANT TO 19 C.F.R. § 351.525(B)(6)(IV) WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In the Final Results, Commerce disregarded Kaptan's arguments that Nur was not a cross-owned input supplier and found "Nur's production of steel scrap was primarily dedicated to Kaptan's production of downstream steel products." Final IDM at Cmt. 1 (**PR 176**). Commerce's determination was unsupported by substantial evidence and not in accordance with the law for the reasons discussed below.

This issue is identical to the same issue raised in Kaptan's challenge of the Department's 2018 final results before this court in case number 21-565, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States.* A decision in that case should dictate the outcome of this issue in this case.

**1.     NUR DOES NOT SATISFY THE INPUT SUPPLIER ATTRIBUTION CRITERIA AS SET FORTH IN THE DEPARTMENT'S REGULATIONS, THE PREAMBLE, AND PRIOR COMMERCE CASES**

When a producer/exporter is selected as a mandatory respondent in a CVD case, Commerce's CVD questionnaire requires, in accordance with the Regulations, the respondent to identify any cross-owned affiliates. The Regulations outline four different categories of companies that fall within the definition of "cross-ownership." 19 C.F.R. § 351.525(b)(6):

(1)     Corporations producing the same product;

(2)     Holding or parent companies;

(3)     Input suppliers; and

(4)     Transfer of subsidy between corporations with cross-ownership producing different products.

*Id*. at § 351.525(b)(6)(ii)-(v). If a company falls within one of these categories and within the definition of cross ownership,[1] then the affiliate must report whether it used any of the alleged subsidies in the case. If subsidies are used, then the benefits from those subsidies are attributed to the producer of subject merchandise. *Id.* at § 351.525(b)(6)(i).

There is no dispute here that Nur fell within the definition of cross-ownership under section 351.525(b)(6)(vi). The sole issue here is whether Nur can be considered an input supplier under section 351.525(b)(6)(iv), thereby necessitating a reporting of the company's subsidies and an attribution of subsidy benefits. For the reasons outlined below, we believe substantial evidence and law demonstrate that the answer to that question is no.

The Regulations are clear that not all input suppliers that fall within the definition of cross-ownership under section 351.525(b)(6)(vi) are required to report subsidies. The requirement is limited to input suppliers where the production of the input is "primarily dedicated to the production of the downstream product:"

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product ***is primarily dedicated to production of the downstream product***, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).[2]

---

[1] Cross-ownership is defined as "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporation." 19 C.F.R. 351.525(b)(6)(vi).

[2] 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

As can be seen, the "primarily dedicated" language is key to the input supplier attribution

analysis. The *Preamble* to the Department's CVD regulations[3] further explains:

> The main concern we have tried to address is the situation ***where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product— the type of input product that is merely a link in the overall production chain***. This was the case with ***stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production***. (See Certain Softwood Lumber Products from Canada, 57 FR 22570, 22578 (May 28, 1992) and Certain Pasta from Italy, 61 FR 30287-309 (June 14, 1996).) We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products. Accordingly, where the input and downstream production takes place in separately incorporated companies with cross-ownership (see discussion below defining cross-ownership) ***and the production of the input product is primarily dedicated to the production of the downstream product***, paragraph (b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the two corporations).
>
> Where we are dealing with input products ***that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product***. For example, ***it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles***. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer. Moreover, we believe that the upstream subsidy provision is still applicable when dealing with lower levels of affiliation. Therefore, if the relationship between the input and downstream producers meets the affiliation standard but falls short of cross-ownership, even if the input product is primarily dedicated to the downstream product, we will only consider subsidies to the input producer in the context of an upstream subsidy investigation.

---

[3] *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ("Preamble").

*Preamble*, 63 Fed. Reg. at 65,401 (emphases added). Thus, both the regulations and the

*Preamble* require that it is only appropriate to attribute subsidies when the input producer's

"production is dedicated almost exclusively to the production of a higher value-added product—

the type of input product that is merely a link in the overall production chain." *Id.*

This position is supported by prior Department cases. In *Forged Steel Fluid End Blocks*

*from Germany* ("FEBs"), the Department determined under analogous circumstances that it

would not be appropriate to attribute the subsidies of two of the respondent's affiliates when

those companies produced non-subject steel products and sold only small amounts of ingot and

scrap to the respondent. The Department explained:

> in deciding whether to attribute subsidies received by BGH Freital and
> BGH Lippendorf to BGH Siegen, Commerce examined BGH Freital's and
> BGH Lippendorf's business activities on the record, followed the
> guidelines mentioned above, and concluded that these companies'
> production are not "dedicated almost exclusively to the production subject
> merchandise." While our use of the phrase "subject merchandise" is
> perhaps misplaced, we find that replacing "subject merchandise" with
> "downstream product" is equally applicable. As noted in the Preliminary
> Determination, **BGH Freital and BGH Lippendorf manufacture non-**
> **subject merchandise including semi-finished steel products, round and**
> **flat bar, and wire. Further, we found that BGH Freital and BGH**
> **Lippendorf supplied BGH Siegen with very small quantities of ingots, of**
> **a kind not used in the production of subject merchandise, and very small**
> **quantities of scrap. Because the quantities of ingots and scrap are so**
> **miniscule, they have a very small impact on BGH Siegen's production**
> **costs**. . . .
>
> The issue of whether production of the input product is primarily
> dedicated to production of the downstream product depends on the
> specific factual situations presented to Commerce, because the nature of
> input and downstream products and production processes vary among
> cases. . .
>
> The record demonstrates that BGH Freital and BGH Lippendorf supplied
> very small quantities of ingots and scrap to BGH Siegen. Analogous to the
> plastic as an input to an automobile example in the CVD Preamble, **one**
> **cannot reasonably conclude that these inputs are dedicated almost**
> **exclusively to the production of downstream products or that these are**

12

> *the type of input products that are merely a link in the overall production chain*. . . .
>
> Therefore, irrespective of whether BGH Freital and BGH Lippendorf are cross-owned with BGH Siegen under Commerce's regulations and practice, we find that BGH Freital and BGH Lippendorf are not input suppliers to BGH Siegen, based on our regulations because record evidence establishes that the quantities and types of materials that BGH Freital and BGH Lippendorf supplied to BGH Siegen during the POI are not primarily dedicated to the production of the downstream product.[4]

The Department has also arrived at the same conclusion in multiple other cases under similar circumstances. In *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ("CTL Plate from Korea 2018"), and accompanying IDM, the Department found that Plantec was not POSCO's cross-owned input supplier and that attributing subsidies received by Plantec was not appropriate. The Department explained:

> The issue of whether production of the input product is primarily dedicated to production of the downstream product *depends on the specific factual situations presented to Commerce because the nature of input and downstream products and production processes vary among cases.* Thus, Commerce determines cross-ownership on a *case-by-case basis by examining the facts of each case*. In this case, as discussed in the Preliminary Results, and consistent with the previous determination regarding Plantec in Cold-Rolled Steel from Korea 2017, 134 we examined both factors that could determine if Plantec was an input supplier to POSCO; *whether Plantec's production was primarily dedicated to the production of downstream product, and whether the inputs provided by Plantec were inputs primarily dedicated to the production of subject merchandise.*

---

[4] *See Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), and accompanying IDM at Cmt. 14 (emphases added).

*Id*. at Cmt. 2. With regard to whether Plantec's production was primarily dedicated to the

production of downstream product, the Department explained it "did not require Plantec's inputs

to be 'exclusively dedicated' to the production of subject merchandise to be considered an input

supplier". *Id*. However, the Department noted:

> in deciding whether to attribute subsidies received by Plantec to POSCO,
> Commerce examined Plantec's business activities as reflected in
> information on the record of this review, followed the guidelines
> mentioned above, and concluded that Plantec's production is not
> "dedicated almost exclusively to the production of a higher value product"
> (i.e., POSCO's steel production) and that ***it is not reasonable to assume
> the purpose of a subsidy to Plantec is to benefit POSCO's products***. As
> we stated in the 85 , ***the record shows that Plantec's primary function is
> the "construction of industrial plant{s}."***

*Id*. (emphasis added). The Department also noted that the inputs provided to POSCO were not

exclusively or primarily dedicated to the production of the downstream product: "like the plastic

to automobile example set out in the CVD Final Rule, inputs that Plantec provided to POSCO

are used in a typical manufacturing process and not in a way that they are primarily and/or

exclusively dedicated to the production of the downstream product." *Id.* The Department

concluded:

> Therefore, consistent with our regulations, we find that Plantec is not
> POSCO's input supplier because record evidence establishes that the types
> of materials and services that Plantec supplied to POSCO during the POR
> are not primarily dedicated to the production of the downstream product.
> Furthermore, ***we cannot conclude from the information provided that the
> purpose of a subsidy provided to Plantec is to benefit the production of
> POSCO's steel product.***

*Id.*

> In its Preliminary Results of the same case, the Department had explained:

> For the reasons described below, we preliminarily determine that record
> evidence shows that the production of POSCO Plantec's input is not
> primarily dedicated to the production of the downstream product,
> including the subject merchandise. ***POSCO's financial statements
> describe POSCO Plantec's category of business as "construction of***

14

*industrial plant."* POSCO's purchases of fixed assets and services from POSCO Plantec during the POR were for maintenance, repair and operation of pre-existing machinery. Further, the record shows that the types of services that POSCO Plantec performed for POSCO are not a part of steel production that is dedicated primarily to the production of a higher value-added product. . . . As the record indicates, POSCO Plantec's fixed assets and the services provided to POSCO during the POR were not primarily dedicated to the steel production process. We, therefore, preliminarily determine that the production of POSCO Plantec's "input" is not primarily dedicated to the production of the downstream product, including the subject merchandise. ***Accordingly, we preliminary find that regardless of whether POSCO and POSCO Plantec are cross-owned, POSCO Plantec does not meet the criteria for a cross-owned input supplier under 19 CFR 352.525(b)(6)(iv).*** Consistent with Commerce precedent, we preliminarily will not attribute subsidies received by POSCO Plantec to the combined sales of POSCO and POSCO Plantec.[5]

Similarly, in *Certain Cold-rolled Steel Flat Products from Korea*, another proceeding involving POSCO and Plantec, Commerce similarly found that it was not appropriate to attribute subsidies received by Plantec to POSCO. In this case, the Department again explained that the issue of whether production of the input is "primarily dedicated to the production of the downstream product depends on the specific factual situations presented to Commerce." It also rejected arguments made by Nucor that it was setting an "exclusivity" standard in deciding whether a particular input is dedicated to the production of the downstream product. Commerce explained:

> The petitioners' arguments that the so-called "exclusivity" standard does not appear in the regulation itself and that Commerce did not cite anything to support this standard are misplaced. We also disagree that the alleged "exclusivity" standard would encourage potential manipulation and make it impossible for Commerce to attribute subsidies to cross-owned input suppliers.

---

[5] *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part*; *2018*, 85 Fed. Reg. 45,185 (Jul. 27, 2020), and accompanying IDM at "Attribution of Subsidies."

PUBLIC VERSION

To be clear, Commerce did not set an "exclusivity" standard or requirement in the post-preliminary results. ***Rather, in deciding whether to attribute subsidies received by POSCO Plantec to POSCO, Commerce examined POSCO Plantec's business activities on the record***, followed the guidelines mentioned above, and concluded that POSCO Plantec's production is not "dedicated almost exclusively to the production of a higher value product" (*i.e.* POSCO's steel production) and that it is not reasonable to assume the purpose of a subsidy to POSCO Plantec is to benefit POSCO's products. ***If the record shows the sole purpose of POSCO Plantec's production activities is to provide inputs to POSCO's steel production, one might reasonably conclude that the purpose of a subsidy to POSCO Plantec is to benefit POSCO's steel production. However, on the contrary, the record shows that POSCO Plantec's productions include construction of a refinery, a cargo terminal in Taiwan, a storage tank in an LNG terminal in Korea, and a luggage processing facility in Korea, etc***.[6]

The Department's decision in *Certain Glass Containers From the People's Republic of China* also addressed the "primarily dedicated" requirement under the regulation. The Department explained in that case that a particular cross-owned affiliate ("Company A") had not been required to submit a Section III questionnaire response because its business activities were not "primarily dedicated" to the production of the input:

> {I}n the instant case, the record evidence does not support a finding that the glass machinery provided by Company A should be considered a primarily dedicated input such that it would meet the attribution criteria set forth in 19 CFR 351.525(b)(6)(iv). Therefore, we did not request a complete Section III questionnaire response from Company A. ***Specifically, Company A's business license indicates that the range of its business activities are broad, explaining that Company A is engaged in "{p}roduction and sales: glass machinery; import and export of goods and technology permitted by the state; assembly and sales: glass machinery, rubber machinery, winery equipment, reducers, other mechanical equipment and parts and related technical consulting services; software development." Thus, the legal scope for Company A as noted in its business license details several kinds of business activities***

---

[6] *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38,361 (June 22, 2020), and accompanying IDM at Cmt. 2.

*beyond merely glass equipment manufacturing, such as rubber machinery and winery equipment. . . .*

As noted above, Company A's business license details a variety of production activities *other than glass equipment manufacturing*. Thus, record evidence in the instant case *does not indicate that Company A's production is "dedicated almost exclusively to the production of a higher value added product"* in the manner suggested by the Preamble or that the purpose of any subsidy provided to Company A would be "to benefit the production of both the input and downstream products." Therefore, Commerce did not specifically request or require a complete Section III questionnaire response from Company A.[7]

Taken together, these cases confirm that when deciding whether to attribute subsidies received by an affiliated input supplier, i.e., to determine whether the input "is merely a link in the overall production chain,"[8] the Department must (1) make its decisions on a case-by-case basis depending on the particular input, the downstream product, and the production process; (2) consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in the case; and (3) determine whether it is "reasonable" to conclude that the purpose of the subsidy to that company would have been to benefit the production of the downstream product.[9] While it is true, as the Department noted in the Final Results, that " the issue of whether production of the input product is primarily dedicated to the production of downstream product depends on the specific factual situations presented to Commerce, because the nature of input

---

[7] *Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), and accompanying IDM at Cmt. 12.

[8] *Preamble* at 65,401.

[9] Commerce states in its Final Results that it disagrees "with the three-step analysis that Kaptan derived from these cases," IDM at Cmt. 1, but presents no legal arguments or examples of cases that detract from the factors that it has consistently considered in other proceedings. Kaptan addresses Commerce's arguments on this issue in greater detail below.

and downstream products and production processes vary among cases,"[10] the criteria established by the regulations, the *Preamble*, and the cases discussed above provide a necessary framework when considering the "specific factual situation" of any given case.

In this case, record evidence does not support a finding that Nur is "merely a link in the overall production chain" for Kaptan's production of subject merchandise (or production *in general*). Nur's primary business is shipbuilding and port services. Kaptan Initial Questionnaire Response at 8 (**PR 77/CR 42**). In fact, more than 99% of its sales are dedicated to this business. Supplemental Affiliation Response at 1 (**PR 40/CR 8**). Nur sold a *de minimis* quantity of scrap of the total steel scrap Kaptan purchased during the POR; Kaptan purchased only 0.01% of the total scrap it purchased for its entire steel product production in the POR from Nur. (**PR 29/CR 6**). It makes little logical sense that the Government of Turkey could intend, *even hypothetically*, to provide subsidies to Nur as a link in the production chain for Kaptan's production of *subject merchandise* when Nur's generation of scrap is a virtually non-existent portion of its business. That is, it is not as if Nur is a known scrap supplier to Kaptan (or anyone). Indeed, some years Nur does not even supply Kaptan with scrap; this is a throw-away by-product that Nur only sells occasionally.[11] Thus, Nur's production is not primarily dedicated to Kaptan's production and the company is a miniscule scrap supplier for Kaptan.

Furthermore, the record demonstrates that Nur's sales of scrap are used by Kaptan to produce both subject and non-subject merchandise. Kaptan explained in its initial response that it produces "steel billets, reinforcing bars, angles, square bars, flat bars, and round bars" all from

---

[10] IDM at Cmt. 1.

[11] *See, e.g., Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 42,353 (July 14, 2020) (Nur was not a cross-owned input supplier in this review).

scrap. Kaptan Initial Questionnaire Response at 9 (**PR 77**/**CR 42**). Thus, Nur is much like the plastics company referenced in the *Preamble*. It is not an input producer, it is a shipbuilder, and the fact that it supplied a miniscule amount of scrap, an incidental byproduct of its production of non-subject merchandise, does not make it an "input supplier" under 19 C.F.R. § 351.525(b)(6)(iv). There is no evidence on the record suggesting otherwise.

### 2. COMMERCE'S PREVIOUS DETERMINATIONS THAT SCRAP CAN BE A PRIMARILY DEDICATED INPUT IN THESE PROCEEDINGS DOES NOT NECESSITATE A SIMILAR FINDING UNDER THE FACTS OF THIS CASE

Commerce argues that "{i}n previous segments of this proceeding, we considered scrap to be a type of input that is primarily dedicated to the production of the downstream steel production, regardless of the amount of scrap purchased from a cross-owned company," and notes that the CIT affirmed its decision in the 2016 administrative review. Final IDM at Cmt. 1.[12]

While Kaptan recognizes that the Department has found previously that scrap can be a primarily dedicated input, these previous findings do not necessitate the same finding in this case given the very specific facts on the record in this review. That decision related to a different set of facts, a different respondent, and a different input supplier. Indeed, Commerce itself notes that it evaluates the "the issue of whether production of the input product is primarily dedicated to the production of downstream product depends on the specific factual situations presented to Commerce, because the nature of input and downstream products and production processes vary among cases." Final IDM at Cmt. 1.  Circumstances can change from proceeding to proceeding

---

[12] *Citing Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051 (Jul. 26, 2019), and accompanying IDM ("2016 Final Results"); *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

that necessitate a new evaluation in each. The prior proceeding involved a different record and a distinct set of arguments as compared to the record of the instant proceeding.

In the 2016 proceeding, Plaintiff Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Içdaş") argued only that "Içdaş Elektrik only sold a small amount of scrap to Içdaş," which Commerce found, and the Court upheld, was not a sufficient reason on its own. *Icdas*, 498 F. Supp. 3d at 1364. Icdas did not present any additional arguments, case law, or regulations to support its position. As the Court stated, "{n}or do Plaintiffs identify any case or statute that requires Commerce to consider the quantity of scrap provided to a downstream producer. . . . While the final quantity may be low, the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer." *Id*.

In contrast, in the instant case, Kaptan has provided substantial and unrefuted record evidence that Nur is not a cross-owned input supplier under the Department's regulations, as supported by the *Preamble* and prior Department cases that support its position. Thus, Commerce's decision in the 2016 review, and the Court's holding based on the specific record of that case, does not necessitate an identical outcome in this case. The facts of the Kaptan – Nur relationship are unique, and therefore finding that Nur is not a cross-owned input supplier in this review is not a reversal of the previous findings regarding scrap in other reviews.

The following facts establish the unique circumstances of this review:

- Nur sold 0.01% of the scrap Kaptan purchased during the POR;

- This sale of scrap represented [      ] of Nur's sales during the POR;

- Nur is a shipbuilder. This industry is completely distinct and has no connection to subject merchandise or steel production in general;

- With the miniscule amount involved, whether or not Nur does or does not sell scrap to Kaptan has a "very small impact" on Kaptan's "production costs."[13] Indeed, at this amount it has no measurable impact.

- Nur is not a constant supplier of scrap to Kaptan year over year demonstrated by the fact that this is the second review in which Nur has been involved.

Given these unique circumstances, it cannot be said that Nur's scrap generation and sale is "the type of input product that is merely a link in the overall production chain." *Preamble*, 63 Fed. Reg. at 65,401. And how could it; Nur's production is focused on products that are significantly more downstream (*i.e.*, ships) than Kaptan's rebar, which is a commodity steel product. Nur's production is the end of the production chain, not the beginning.

Given these unique circumstances, it cannot be said that Nur's production is "dedicated almost exclusively to the production of a higher value added product." *Id.* Nur's production is the higher value added product.

And given these unique circumstances, it certainly cannot be said that one can reasonably conclude that the purpose of a subsidy to Nur (*i.e.*, land rent exemptions for its shipbuilding production) is to benefit Kaptan's commodity steel production.

For these reasons, the Department should find that Nur is not a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).

### 3.   COMMERCE'S OTHER ARGUMENTS JUSTIFYING ITS DETERMINATION THAT NUR IS A CROSS-OWNED INPUT SUPPLIER ARE WITHOUT MERIT AND SHOULD BE DISREGARDED

Commerce's other arguments in support of its position that Nur is a cross-owned input supplier are entirely without merit and should be disregarded.

---

[13] *FEBs* IDM at Cmt. 14.

Commerce claims that it disagrees that the "primary business activity of the affiliated company that is providing the input is a relevant factor in this case, or even most cases."  Final IDM at Cmt. 1. Commerce provides no legal basis or citation supporting its disagreement, and its position directly contradicts the *Preamble* and the prior cases on this issue, as summarized above. Specifically, the *Preamble* explained that the primary purpose of attribution is "where a subsidy is provided to an input producer ***whose production is dedicated almost exclusively to the production of a higher value-added product—the type of input product that is merely a link in the overall production chain***. This was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production."  *Preamble*, 63 Fed. Reg. at 65,401 (emphasis added).  The *Preamble* further explained here that: "the purpose of a subsidy provided to the input producer ***is to benefit the production of both the input and downstream products***."  *Id*. Further, the example provided in the *Preamble* confirms that the Department must consider the primary business activities of the affiliated company should be a part of the Department's analysis: "it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles." *Id*.

Similarly, in *FEBs from Germany*, Commerce specifically explained: "BGH Freital's and BGH Lippendorf's **business activities on the record**, followed the guidelines mentioned above, and concluded that these companies' production are not "dedicated almost exclusively to the production subject merchandise." While our use of the phrase "subject merchandise" is perhaps misplaced, we find that replacing "subject merchandise" with "downstream product" is equally applicable." *FEBs from Germany*, IDM at Cmt. 14 (emphasis added).  As discussed above in *CTL Plate from Korea 2018*, *Certain Cold-rolled Steel Flat Products from Korea*, and *Certain*

*Glass Containers,* among others, Commerce examined the primary business activities of the affiliated company in making its determination. Thus, there is no basis to Commerce's conclusion that the primary business activity is not a relevant factor to consider when deciding on attribution of subsidies.

Commerce also argues that in *FEBs from Germany* it specifically stated that it did not set a *de minimis* standard or requirement in determining whether subsidies that the input suppliers received were attributable to the subject merchandise producer. Thus, Commerce argues the fact that Nur sold a *de minimis* quantity of the total steel scrap Kaptan purchased during the POR is immaterial. Kaptan recognizes that in *FEBs from Germany*, Commerce stated that it was not applying a *de minimis* standard. However, as Commerce went on to explain, in deciding whether the production of the companies in that case was "dedicated almost exclusively to the production of subject merchandise," Commerce considered multiple factors on a case-specific basis, explaining:

> BGH Freital and BGH Lippendorf manufacture non-subject merchandise including semi-finished steel products, round and flat bar, and wire. Further, we found that BGH Freital and BGH Lippendorf supplied BGH Siegen with very small quantities of ingots, of a kind not used in the production of subject merchandise, and very small quantities of scrap. Because the quantities of ingots and scrap are so miniscule, they have a very small impact on BGH Siegen's production costs.

*Id*. Analogous circumstances exist in this case. Nur manufactures non-subject merchandise, supplied very small quantities of scrap – of a kind applied to both subject and non-subject merchandise, and because the quantities were miniscule, they had no measurable impact on production costs. Commerce has pointed to no distinguishing circumstances as to why its reasoning in *FEBs* would not apply in the instant case.

**B.    COMMERCE'S DETERMINATION FINDING NUR'S LAND RENT EXEMPTION COUNTERVAILABLE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In its Final Results, the Department countervailed Nur's land rental exemption agreement under the program entitled "Land for Less Than Adequate Remuneration (LTAR) under Law 5084." Commerce made two errors with this finding.  First, it incorrectly countervailed this program as a "less than adequate remuneration" program rather than revenue foregone.  Second, the Commerce's benchmark selection is unsupported by substantial evidence

**1.    COMMERCE'S CALCULATION OF THE BENEFIT FOR KAPTAN'S RENT FREE LAND AS A GOOD FOR LESS THAN ADEQUATE REMUNERATION RATHER THAN AS REVENUE FOREGONE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In determining whether the rental exemption for Nur's land provided a benefit, the Department considered the exemption to provide a good for LTAR under 19 U.S.C. § 1677(5)(D)(ii) and thereby calculated the benefit using a land rental "benchmark" pursuant to 19 C.F.R. § 351.511. The Department's normal practice, however, for the calculation of government assistance received in the form of wholly exempted rental amounts is to treat assistance as revenue foregone under 19 U.S.C. § 1677(5)(D)(ii), rather than as good for LTAR. In such an instance, the benefit is the exempted amount from the contract or a listed governmental rental price rather than a comparison to a rental "benchmark" the Department creates for the purposes of the proceedings. The failure to follow this practice is unreasonable and unsupported by substantial evidence.

In this case, as explained more fully below, the record establishes that Nur used and occupied land for the development of a shipyard. Nur entered into an agreement with the government, which owns the land, to use the land for a fixed term of 49 years and for an ascertainable charge over the term. *See* Kaptan Initial Questionnaire at Exh. 31 (**PR 77**/**CR 42**).

As per the contract, this amount was [          ] per year. *Id.* Pursuant to this agreement, those land use charges were waived in lieu of Nur meeting agreed investment and employment targets. The Department however ignored those contractual provisions and instead found that this agreement was not a lease and that this agreement instead provided a good for LTAR, calculating a rental benchmark of [          ] per year to serve as the exempted amount; this resulted in a CVD rate of 1.75%. The Department's conclusion in the Final Results that this land agreement was not a lease within the common definition and use of that term, and that conditionality for the waiver of the charges somehow renders any benefit under this agreement as a financial contribution in the form of the provision of goods under 19 U.S.C. § 1677(5)(D)(iii) was unsupported by record evidence and contrary to consistent agency practice and law.[14]

### a. <u>Any Benefit from the Exemption from Payment Under the Land Use Agreement Must be Calculated as Revenue Foregone</u>

The exemption from payment to the government for the usage of land owned by the government is not a provision of goods at LTAR, and the Department has generally not treated it as such in previous cases. The Department itself acknowledged in the underlying proceeding that is has found "discounts and exemptions from lease terms to be revenue foregone pursuant to section 771(5)(D)(iii) of the Act . . . ." Final IDM at Cmt. 2. The record in this case establishes that the government set a price for the usage of the land under the agreement at issue. *See* Article 16 of the Agreement (**PR 77/CR 42**). As such, the exemption from paying this amount is no

---

[14] The difference in the treatment of this program as revenue foregone or goods for LTAR changes how the benefit is calculated, and ultimately the CVD rate for the program. Under revenue foregone, the benefit is the exempted amount, i.e., the amount identified in the lease agreement. In this case the *ad valorem* CVD rate for this program would have been 0.01% under this method. Under a goods for LTAR analysis, the Department takes the difference between what was paid (here, zero) and a benchmark price. This resulted in an *ad valorem* rate of 1.60%.

different than the exemption for paying other amounts to the government such as taxes, duties or

fees under 19 C.F.R. § 351.509, 351.510 (providing for the treatment of income tax exemptions,

VAT exemptions, import duty exemptions). In other words, land rental exemptions result in

"foregoing or not collecting revenue that is otherwise due," rather than "providing goods or

services" within the meaning of 19 U.S.C. § 1677(5)(D). *See Laminated Woven Sacks from the*

*Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determinations*, 84 Fed.

Reg. 14,647 (Apr. 11, 2019), IDM at 2. Land and LTAR Programs (stating "this program

constitutes a financial contribution pursuant to section 771(5)(D)(ii) of the Act in the form of

revenue foregone because the GOV provides land rent reductions and exemptions"). This is

consistent with the Department's practice in other cases.

In the CVD investigation on *Non-Oriented Electrical Steel from Taiwan*, the Department

investigated a "Major Infrastructure Projects --Land Lease Program" (Land Lease Program)"

which provided for "a 40 percent discount off standard lease rates" set by the government. *Id.*

The Department concluded that the program constituted "a financial contribution in the form of

foregone revenue and confer{ed} a benefit within the meaning of sections 771(5)(D)(ii) and

771(5)(E) of the Act." *Id.* The Department went on to explain that "{t}o calculate the benefit

from this program, we calculated the difference between what DSC would have paid at the

standard lease rate and what it actually paid." *Id.*

The land use agreement in this case is clearly a lease for which a rental amount was

determined. That the Department departed from its normal practice, which it acknowledged here,

and which it applied in *Non-Oriented Electrical Steel from Taiwan*, it must provide an

explanation that is adequate to enable the court to determine whether doing so is reasonable. *See*

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376–77 (Fed. Cir. 2016). It must

"examine the record and articulate a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Nothing in the Department's determination in this case explains how the department determined that the land use agreement was a provision of goods at LTAR. It is axiomatic that the court will uphold an agency determination only where "{} the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, Inc., 419 U.S. 281, 286 (1974).

### b.   Nur's Land Use Agreement is a Lease as it Meets Every Element that Defines a Lease

Despite the clear past precedent that rental exemptions are historically treated as revenue foregone rather than as goods at LTAR, the Department nevertheless determined in this case that the revenue foregone provisions (and resultant calculation differences) do not apply because "the agreement between Nur and the local authority is not a lease, and does not outline a lease term, but instead is a right to use land conditioned on fulfillment of obligations." IDM at Cmt. 2. There is inadequate support for this finding in the record. Record evidence indisputably shows in this case that the land use program under which Nur may have received benefits involved the grant of the right to use a specific plot for a period of 49 years for an ascertainable fee, an exemption for which would be granted on the condition that specified investment and employment commitments have been met. Kaptan Initial Questionnaire Response at Exh. 31 (**PR 77/CR 42**). This creates a lease under any normal definition of the term, as described below.

Nowhere in the countervailing duty laws is the term "lease" defined. *See generally,* 19 U.S.C. § 1677 *et seq.* In such instances, the court will look to the ordinary meaning of the language at issue. *Nucor v. United States,* 927 F.3d 1243, 1249 (Fed. Cir. 2019) (using common definitions of words used in the context of countervailing duty determinations). The Merriam-Webster Dictionary defines a lease as "a contract by which one conveys real estate, equipment,

or facilities for a specified term and for a specified rent." Merriam-Webster.com Dictionary,

Merriam-Webster, (available at https://www.merriam-webster.com/dictionary) (last accessed

Apr. 2, 2022). We can also look to the definition of the word "rent," which Merriam-Webster

defines as "a usually fixed periodical return made by a tenant or occupant of property to the

owner for the possession and use thereof." *See id.* Consistent with Merriam-Webster, Black's

Law Dictionary defines a lease as a "contract by which the rightful possessor of real property

conveys the right to use and occupy that property in exchange for consideration . . ." *See* Lease,

Black's Law Dictionary (10th Edition, 2020). Rent is defined by Black's as "consideration paid,

usually periodically, for the use or occupancy of property." *Id.*

      What is salient from each of the common definitions of the terms "lease" and "rent" is

that consideration is paid for the right to use and occupy real property. In the instant case, the

Department has acknowledged that Nur entered into an agreement that provided for

consideration in exchange for the use of the land in question. Final IDM at Cmt. 2. Notably,

nowhere in the common definitions of the words "lease" or "rent" are there qualifiers or

requirements that they be referred to as such or that they be given special titles accordingly. *See*

*Nucor* 927 F.3d at 1250 (taking note of what common definitions do not include in rejecting a

definition offered by Commerce).

      The record evidence is clear that the usage agreement entered into by Nur is, by any

definition, a lease. As such, there is no basis in the record or in law for the Department to

conclude that Nur's land use agreement is not a lease such that it justified the departure from its

acknowledged practice of treating discounts or waivers from lease terms as revenue forgone.

c.    **Commerce Unlawfully Concluded that Nur's Land Use Agreement was a "Conditional Easement"**

In its Final Results, the Department found that the Government of Turkey's land use program was a "conditional easement to use government-controlled land for free."  Final IDM at Cmt. 2 (**PR 176**). The Department explained this finding by citing the Final Results of the previous review where it found Nur's land use agreement was not a lease and the GOT's confirmation that no changes were made to the program.  *Id.*

In the previous review, the Department rejected the argument that this was revenue foregone because "land contract is structured as a conditional easement to use government-controlled land for free."[15] The Department explained that:

> rather than paying a certain amount of rent, the local government accepted other consideration for use of the land in the form of investment and employment commitments. Further, the GOT described the program as a free use permit rather than an exemption from lease payments and provided application materials which also refer to the type of use as a free easement or free usage permit.

*Id.* The Department then concluded that "the agreement between Nur and the local authority is not a lease, and does not outline a lease term, but instead is a right to use land conditioned on fulfillment of obligations." *Id.* What is unclear however is how describing this contract as a conditional easement as compared to a lease agreement changes the financial contribution arrangement and renders, as the Department believed, the cases cited above inapplicable. Whether the money charged is referred to as rent or an easement fee, they are functionally equivalent; they are both money obligations that would be otherwise owed to the government but

---

[15] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Recession, in Part; 2018*, 86 Fed. Reg. 53,279 (Sept. 27, 2021), at IDM at Cmt. 6.

for the agreement/program. Under either a normal lease agreement or Nur's current usage agreement, there is a set term of use (here, 49 years), an exclusive possessory interest (i.e., no other party, including the owner, can use the land), set obligations/restrictions, and the usage or rental amount. When parties sign a lease agreement with a government authority with a zero dollar annual rent, it, again, is functionally equivalent to the use agreement Nur signed for "free-of-charge usage or an exemption of the easement fee.

Moreover, to the extent that the easement versus lease distinction is important, we note that the Department has determined that "Nur entered into a lease and investment agreement with the local government in the Surmene district to use a state-controlled area of land free of rent" and that this program provides "rent-free land pursuant to Law 5084."[16] Thus, the Department determined that this program provides free rent and not the usage of land in the form of an easement.

The facts of this case permits the Department to use its normal benefit analysis for land exemptions under the revenue foregone rubric and do not require reliance on a benchmark. In this case, Nur's land agreement outlines the specific annual "easement fee"[17] that would be owed if the investment and employment obligations (i.e., the terms of the rent free condition) are not met. In other words, the annual easement fee is forgiven so long as Nur uses the land in the agreed upon manner and therefore represents the amount of revenue that the government has foregone in providing Nur with a fee exemption. Therefore, to calculate the benefit for this program, the Department should take the annual easement fee amount in the contract, [        ],

---

[16] PDM at 13 (**PR 148**).

[17] Kaptan IQR at Exh. 31, Art. 16 (**PR 77/CR 42**).

and divide it by Nur's and Kaptan's combined sales, [                    ], resulting in an *ad valorem* rate of 0.01%.

### d.   The Resort to a Benchmark in this Case was Unsupported by Record Evidence and Contrary to Law

The treatment of this program as revenue foregone as compared to the provision of goods for LTAR has a direct impact on the calculation of benefit. The Department has explained that "{n}ormally, we would find a benefit from rent exemptions in the amount of the rent savings." *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,342 (June 4, 2013) ("Shrimp from Vietnam"). That is, the benefit equals the amount of rent that would have been owed, but for the exemption, just like the calculation of benefits resulting from tax or duty exemptions under 19 C.F.R. § 351.509.

In contrast, the benefit for goods for LTAR is based on an entirely different analysis. The provision of goods and services is governed by 19 C.F.R. § 351.511 which seeks to evaluate the provision of goods or services were "at preferential rates." *Preamble*, 63 Fed. Reg. at 65,377. In making this adequacy of remuneration analysis, the Department selects a benchmark pursuant to the three-tier hierarchy set forth in 19 C.F.R. § 351.511 taking into account "prevailing market conditions" such as "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). These provisions are used when seeking to determine whether the prices the respondent paid for the good are less than market prices. The LTAR provisions are not needed when a total exemption is involved and the exempted amount in known.

In instances where the rent that would have been paid is known, the benefit analysis indisputably equals that rent amount. *See Non-oriented Steel from Taiwan*, 79 Fed. Reg. 61,602

(Oct. 14, 2014), IDM at Cmt. 8. The facts of this case permit the Department to follow this normal benefit analysis for land rent exemptions under the revenue forgone rubric and do not require reliance on a benchmark. In this case, Nur's land agreement provides the rental amount that would be owed if the investment and employment obligations (*i.e.*, the terms of the rent-free condition) are not met. [

] *See* Kaptan Initial Questionnaire Response at Exh. 31 (**PR 77/CR 42**). As indicated in our Initial Questionnaire Response, pursuant to this Article 16, the amount of rent owed on an annual basis if the milestones are not met would be:

| Total Investment | [           ] |
|---|---|
| 50% | [           ] |
| # of 1000s | [        ] |
| 5 per 1000 = Annual Fee | [         ] |

*Id*. Thus, the amount of rent that Nur was exempted from paying, and the amount of revenue forgone and not paid to the government is [          ] per year, as stipulated in the contract. *Id*. This is the rental amount that Nur would have to pay to continue to use the land for the term of the lease and therefore represents the amount of revenue that the government has foregone in providing Nur with a rental exemption.

2. **THE DEPARTMENT'S SELECTION OF AN INDUSTRIAL RENT BENCHMARK WITHOUT ADJUSTING THE BENCHMARK TO REMOVE RENT ATTRIBUTED TO BUILDING RATHER THAN LAND ONLY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW**

In its Final Results, the Department selected a land benchmark based on Petitioner's submission of benchmark data. This benchmark consisted of rental prices contained in a 2020

Colliers International's Real Estate Market Turkey Review Report ("CBRE Report").[18] The rental prices were for eight different localities that were listed in the section of the Report called "industrial and logistical facility rent." Petitioner Benchmark Submission at Exh. 1 (**PR 136**). Because these rental prices covered the use of land *and* facilities, they are inappropriate to use as the benchmark for Nur's land (which is exclusive of the facilities that Nur developed and built on the land). Therefore, if the Department continues to view this as an LTAR program rather than a revenue foregone program, the Department's failure to take into account these comparability factors in its benchmark renders its decision unlawful.

The selection of benchmarks for LTAR programs is governed by 19 C.F.R. § 351.511. Both this regulation and 19 U.S.C. § 1677(5)(E)(iv) require the Department to consider "product similarity" or "other factors affecting comparability" in its benchmark selection. In making this analysis, the Department has explained that the use of a commercial benchmark should be based on prices for goods or services that are reasonably comparable to those provided by the government.[19] With regard to land, two factors affecting comparability are relevant – the location of the land and whether the land price includes developed land with structure or undeveloped land.

In *Aluminum Sheet from Bahrain*, the Department discussed whether the use of petitioner's land benchmark price was appropriate when the benchmark prices included

---

[18] IDM at Cmt. 2 (**PR 176**).

[19] *Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333, IDM at Cmt. 4 (Mar. 8, 2021) ("Aluminum Sheet from Bahrain"); *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640, IDM at Cmt. 1 (Sept. 28, 2005).

buildings on the land. Citing to the comparability factors outlined in section 351.511(2), the

Department explained:

> In this investigation, the land rental prices contained in the Savills Report
> are for properties that are more comparable to the land leased by
> GARMCO from the GOB than the price for rental property contained in
> the petitioners' benchmark submission. Specifically, the rental prices in
> the Savills Report are for land, which is what GARMCO rented from the
> GOB. In contrast, the rental price in the petitioners' benchmark
> submission is for a warehouse and not only land. As such, the petitioners'
> benchmark reflects the price for higher valued property because it includes
> completed industrial buildings in addition to the price for land.

*Aluminum Sheet from Bahrain* at IDM Cmt. 4. Similarly, in *Zhaoqing New Zhongya Aluminum*

*Co. v. United States*, 37 C.I.T. 1003, 1006 (2013), as amended (July 19, 2013), the Court rejected

Commerce's use of a land benchmark from fully developed urban land to compare to

respondent's undeveloped land.

Based on the above Department and Court analyses, the Department should have used a

land only rental price that is exclusive of facility rental in order to compare the rental price that

Nur would have paid on an apples-to-apples basis. As in *Aluminum Sheet from Bahrain*,

benchmark used reflects the price for higher valued property because it includes completed

industrial buildings in addition to the price for land" and thus, is completely inappropriate to

compare to Nur's land only rental price. There is no dispute that the "easement fee" that Nur was

exempt from was only for the use of the actual land and did not cover any buildings. Indeed, the

contract outlines the very specific building construction and development that Nur itself must

undertake to be exempt from the fee to use the land. Comparing the land use fee that Nur is

exempt from paying to in order to be exempt from the fee to use the land.  Comparing the land

use fee that Nur is exempt from paying to industrial rental fees which include the land *and* the

facilities is highly distortive.  When significant issues regarding comparability exist, as they do

here, the statute and regulations requirement that adjustments be made or steps be taken to ensure comparability. *See Aluminum Sheet from Bahrain* at IDM Cmt. 4.

In its administrative case brief, Kaptan provided the Department with the following alternatives to compare Nur's land rental exemption to a land benchmark:

(1) The easement fee set forth in the land contract. This is the fee Nur is exempt from paying based (allegedly) on Law 5804 and the contract. Based on the unique circumstances of this case, this is the only price on the record that reflects the rental or usage cost of the land only. This is the most accurate method that is consistent with the Department's past practice.

(2) Public land rental prices Kaptan submitted in Exhibit 1 of its benchmark submission on November 4, 2021. This is an appropriate tier 1 benchmark in this case as it reflects a price from a competitively run government auction. 19 C.F.R. 351.511(a)(2)(i). The *Preamble* states that this includes instances where the "competitive bid procedures … are open to everyone, that protect confidentiality, and that are based solely on price." *Preamble*, 63 Fed. Reg. at 65,377.

First, the government website appears present opportunities for competitive bidding. Specifically, the website represents a "tender." A tender is generally defined as:

> A tender is **an invitation to bid for a project or accept a formal offer** such as a takeover bid. Tendering usually refers to the process whereby governments and financial institutions invite bids for large projects that must be submitted within a finite deadline.[20]

---

[20]Kaptan *Response to Pre-Preliminary Comments* at 2, (Nov. 11, 2021) citing: https://www.investopedia.com/terms/t/tender.asp#:~:text=A%20tender%20is%20an%20invitatio n,submitted%20within%20a%20finite%20deadline. (**PR 142**).

In addition, the last page of the exhibit in the section called "Land Details," there is a reference to "2886". This likely refers to "State Bidding Law No. 2886"[21], which again confirms the existence of competitive bidding.

Second, the website is open to the public due to its public accessibility on the internet and that any individual or company appears to be able to respond to the tender. Since the submission is made through this internet portal, the confidentiality of the submitter is guaranteed. Third and finally, based on the fields provided for the tender, price seems to be the only factor that is relevant.

Given the advances in technology and the internet since the implementation of the regulations in 1997, the definition of an "auction" must be viewed consistent with the times. There is no reason why competitive bidding through a government website cannot be viewed as an "auction" for tier one benchmark purposes. Accordingly, based on the above, these prices fall squarely with the modern definition of a competitively run government auction and should be used as a tier one price in this case.

(3) Adjusting Petitioner's land rental benchmark by the rental ratio outlined in Nur's land contract. Based on the calculation outlined in Article 16 of the contract, the annual rent amount is 0.25% of the invested amount (*i.e.,* [                    ]). In other words, the contract considers the land to be valued at 0.25% of the amount Nur incurred to develop the land and build the facilities. Thus, using this percentage, the revised benchmark for Q2 and Q4 is 0.03. The benefit calculation would therefore be revised as follows:

---

[21] Colakoglu First Supplemental CVD Questionnaire Response at Exhibit S-5, Art. 7 (July 28, 2021). **(PR 113/CR 96)**.

PUBLIC VERSION

| Area (square meters) | Month | Rent paid (TL) | Revised Benefit |
|---|---|---|---|
| [          ] | January | ₺0.00 | [          ] |
| [          ] | February | ₺0.00 | [          ] |
| [          ] | March | ₺0.00 | [          ] |
| [          ] | April | ₺0.00 | [          ] |
| [          ] | May | ₺0.00 | [          ] |
| [          ] | June | ₺0.00 | [          ] |
| [          ] | July | ₺0.00 | [          ] |
| [          ] | August | ₺0.00 | [          ] |
| [          ] | September | ₺0.00 | [          ] |
| [          ] | October | ₺0.00 | [          ] |
| [          ] | November | ₺0.00 | [          ] |
| [          ] | December | ₺0.00 | [          ] |
|  | Total |  | [          ] |

The Department's rejection in the Final Results of the above alternatives was unsupported by record evidence. Regarding the first option, the Department stated that it did not consider the terms outlined in the contract to constitute a lease, thus, there is no rental prices as such being foregone by the government.[22] As discussed above, this determination is unsupported by record evidence and not in accordance with the law.

The Department also cursorily dismissed the second option above because the prices outlined in Kaptan's benchmark submission "provide no details on how the government carried

---

[22] Final IDM at Cmt. 2.

out the actual provisions of the land to the eventual receipt" and found "the use of land rent prices from a government auction is inappropriate where independent rental benchmarks were provided by the petitioner on the record."[23] However, the Department entirely failed to address Kaptan's arguments that it is inappropriate to use the rental benchmarks provided by petitioner given the fact that they cover the use of land *and* facilities, while Nur's land is exclusive of the facilities that Nur developed and built on the land. Finally, the Department provided no basis for its rejection of the third alternative above. Because the Department failed to address "a relevant and material argument," it "failed to explain its determination with sufficient clarity,"[24] warranting a remand on this issue.

### C.    COMMERCE'S DETERMINATION FINDING THAT EXEMPTIONS FROM BANK AND INSURANCE TRANSACTIONS TAX ("BITT") ON FOREIGN EXCHANGE TRASNACTIONS ARE SPECIFIC WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH THE LAW

In its Final Results, the Department countervailed the BITT exemption program. In finding the program specific, the Department explained that it was "specific under 771(5A)(D)(i) of the Act" because "legislation providing the subsidy expressly limits access to the subsidy to an enterprise or industry." IDM at Cmt. 3 (**PR 148**). This is not accurate and should be reversed.

19 U.S.C. § 1677(5A)(D)(i) states "where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an

---

[23] *Id.*

[24] *See Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1348 (Ct. Int'l Trade 2020) Because Commerce failed to address ZMC's relevant and material argument regarding the labor union's inability to control majority shareholder rights, Commerce did not meet the requirements in 19 U.S.C. § 1677f(i)(3)(B) and failed to explain its determination with sufficient clarity. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 13053 (Fed. Cir. 2005). ("{A}n agency must explain its action with sufficient clarity to permit 'effective judicial review.'" (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973))). Therefore, the court remands this issue to Commerce for further explanation.").

enterprise or industry, the subsidy is specific as a matter of law." However, where the authority

establishes "objective criteria" to satisfy the applicable legislation, the subsidy will not be

considered specific. The statue states in part (ii):

> (ii) Where the authority providing the subsidy, or the legislation pursuant
> to which the authority operates, establishes objective criteria or conditions
> governing the eligibility for, and the amount of, a subsidy, the subsidy is
> not specific as a matter of law, if--
> (I) eligibility is automatic,
> (II) the criteria or conditions for eligibility are strictly followed, and
> (III) the criteria or conditions are clearly set forth in the relevant statute,
> regulation, or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions"
> means criteria or conditions that are neutral and that do not favor one
> enterprise or industry over another.

Information submitted by the GOT in the challenged review demonstrates that this law obtains

objective criteria and cannot be specific.

In its responses before the Department, the GOT explained the BIIT "program" as

follows:

> There is no program as "Exemption on Exchange Tax for Foreign
> Exchange Transactions". The BITT rates are determined by the Annexed
> Decision of the Cabinet Decree No. 98/11591 dated August 28, 1998.
> Before May 15, 2019, the BITT rate set for all foreign exchange sales was
> 0%. To restrict speculative and high frequency foreign exchange
> movements, with Presidential Decree no 1106, BITT rate for foreign
> exchange sales is increased to 0,1%. On the other hand, with this
> amendment, the below stated transactions will remain to be subject to 0%
> BITT:
>
> Foreign exchange sales between banks and authorized institutions or
> among each other;
> · Foreign currency sales that are made to the Ministry of Treasury and
> Finance; and
> · Foreign currency sales made to corporate borrowers having foreign
> currency loan payables, by the lender banks or the banks that act as
> intermediary to the utilization of the foreign currency loan.

Afterwards, with the Presidential Decree no 1149, the below stated transactions have been added to the foreign exchange transactions which are subject to 0% BITT rate, from the date of June 18, 2019:

· Foreign exchange sales to enterprises having industrial registry certificate,

· Foreign Exchange sales to exporters

Finally, BITT rate for foreign exchange transactions has been increased to 0,2% by the Law No. 7194 published in the Official Gazette numbered 30971 dated December 7, 2019.

With this regard, foreign exchange sales that are made to any enterprise having an industrial registry certificate are subject to 0% BITT rate without any exceptions. Industrial registry certificate can be obtained by any industrial establishment.

GOT NSA Response at 1-2 (**PR 122/CR 100**).

In its brief, Kaptan noted that the law is applicable to all exporters and all manufactures since all manufacturers are able to obtain industrial registry certificates.  Kaptan Admin. Case Brief at 23 **PR 164/CR 119**.  Thus, the program has objective criteria and is open to all manufactures and exporters.   In rejecting this argument Commerce found:

The basis for this claim is the GOT's explanation that an industrial registry certificate can be obtained by any industrial establishment. However, the GOT did not further define the parameters under which it defines "industrial establishments" or identify and explain the criteria under which it grants or denies industrial registry certificates. The GOT's statement that an industrial registry certificate can be obtained by any industrial establishment is not a basis on which to conclude that the GOT does not limit the BITT exemption to specific enterprises.

Final IDM at Cmt. 3 (**PR 176**).  This finding is not accurate.  In its response, the GOT explained that :

**All manufacturers in Turkey must register to the Industrial Registry Certificate System** according to the Article 2 of the Law of the Industrial Registration No. 6948 (See Exhibit 2).  Therefore, since all manufacturers in Turkey are required to have an industrial registry certificate and the applicable BITT rate is 0% for any enterprise having an industrial registry certificate, this alleged subsidy program is broadly available and widely used throughout the economy. Therefore GOT considers that application

PUBLIC VERSION

of 0% BITT rate is non-countervailable. As can be seen from Exhibit 3, **as of 2019 there are 139.642 enterprises having an industrial registry certificate**.

GOT NSA Response at 6 (**PR 122/CR 100**).  .  Exhibit 2 of that response contains the registry law which states that:

> **Article 1 – (Amended first paragraph: 18/6/2017-7033/3 art.)** The places that produce or obtain a material continuously and in series by changing the characteristics, shape, precision or composition of a substance or by processing these substances with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor and the places where the mines are extracted and processed by are considered industrial enterprise, the work done here are considered industrial works and those who run these are considered industrialist. **(Amended second paragraph: 18/6/2017-7033/3 art.)** Establishments that carry out continuous and serial repairs and plants that produce electricity or other energy, large construction sites such as shipbuilding and enterprises that produce information technology and software are also included in this article.
>
> Handicrafts and domestic crafts and small repair shops are not subject to this law. However, the Ministry of Economy and Trade, may appoint and announce the organization among them, which will be subject to this law in terms of the type and amount of material it produces and obtains.
>
> **Article 2 – (Amendment: 18/6/2017-7033/4 art.)**
> It is obligatory for industrial enterprises to be registered in the industrial registry to be kept at the Ministry of Science, Industry and Technology and to submit the corresponding industrial registry certificate to authorized officials.
>
> Industrial enterprises must pre-register with the industrial registry before starting production activities. For industrial enterprises to be issued business and working licences, the letter stating that they are registered in the industrial registry is sought by the administrations that issue business and working licenses.

This record evidence shows that all manufacturers in Turkey must register for an industry certificate.  There are no criteria outlined in this law other than qualifying as an "industrial enterprise."  This criteria does not exclude any particular industry and covers all industries in Turkey.  This evidence shows that:

- eligibility is automatic – once eligible, no application process is necessary and the exemption is automatically applied;

- criteria is strictly followed – there is no evidence on the record that the criteria is not strictly followed;

- criteria is clearly set forth in the law – the Presidential Decree states:

> e) **(Paragraph amended by President's Decree no. 1106 (Enforcement; 15.05.2019) and 1149 (Enforcement; 18.06.2019))** 1 per thousand over the sales amount in foreign exchange transactions, and zero over the sales amount in foreign exchange transactions listed below;
>
> 1) Foreign exchange sales among banks and authorized institutions or to each other,
>
> 2) Foreign exchange sales to the Ministry of Treasury and Finance,
>
> 3) For the payment of foreign currency loans, foreign exchange sales to the debtor by the bank using or intermediating in the use of foreign currency loans,
>
> 4) Foreign exchange sales to enterprises with industry registry certificate,
>
> 5) Foreign exchange sales to exporters who are members of Exporters' Unions, (***)

- f) (Paragraph added by R.K.K. no. 2010/1182 (Enforcement;20.12.2010) and amended by R.K.K. no.

GOT NSA Response at Exh. 1 (**PR 123/CR 101**).

Taken together, record evidence shows that each of the statutory criteria have been met to determine that this program is no de jure specific.  Commerce ignored this evidence in its Final Results requiring a remand.

## **CONCLUSION**

Kaptan requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP
*/s/ Andrew T. Schutz*
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW, Ste. 650

PUBLIC VERSION

Washington, DC 20005
(202) 783-6881

Dated:  January 13, 2023

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiff's Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 13,012 words, less than the 14,000 word limit.


*/s/ Andrew T. Schutz*

Andrew T. Schutz

*Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

Dated: January 13, 2023