## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| | x | |
| | : | |
| KAPTAN DEMIR CELIK ENDUSTRISI VE | : | |
| TICARET A.S. | : | |
| Plaintiff, | : | |
| | : | Court No. 22-00149 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | **PUBLIC VERSION** |
| Defendant, | : | |
| and | : | |
| | : | |
| REBAR TRADE ACTION COALITION, *et al*., | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | x | |

### PLAINTIFF'S REPLY BRIEF

Andrew T. Schutz
Jordan C. Kahn
Kavita Mohan

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: June 29, 2023

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................. 1

   I.     THIS COURT'S DECISION IN KAPTAN I NECESSITATES A REMAND ON
        THE CROSS-OWNERSHIP ISSUE ..................................................................... 1

       A.   KAPTAN I ....................................................................................................... 2

       B.   GUJARAT ........................................................................................................ 3

       C.   NUCOR .......................................................................................................... 4

       D.   SUMMARY ..................................................................................................... 6

   II.    THE GOVERNMENT'S AND RTAC'S ARGUMENTS ON NUR'S LAND
        RENT EXEMPTION FAIL ................................................................................. 8

       A.   NUR WAS EXEMPTED FROM PAYING RENT/FEES; THIS IS REVENUE FOREGONE . 8

       B.   ADJUSTMENTS TO THE BENCHMARK SHOULD HAVE BEEN MADE ..................... 13

   III.   THE GOVERNMENT'S AND RTAC'S ARGUMENTS THAT KAPTAN
        FAILED TO EXHAUST ARGUMENTS CONCERNING THE BITT
        EXEMPTION PROGRAM ARE MERITLESS ................................................... 17

CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

## Court Decisions

*ABB, Inc. v. United States*, 920 F.3d 811 (Fed. Cir. 2019) ............................................................. 17

*Boomerang Tube LLC v. United States*, 856 F. 3d 908 (Fed. Cir. 2017) ...................................... 20

*Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334  (Ct. Int'l Trade 2020) ................ 17

*Consol. Bearings Co. v. United States*,  348 F.3d 997 (Fed. Cir. 2003) ...................................... 17

*Gujarat Fluorochemicals Ltd. v. United States,* 617 F. Supp. 3d 1328 (Ct. Int'l Trade 2023) ....... 3

*Icdas Celik Enedi Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .............................................................................................................................. 2

*Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Ct. No. 21-00565 ..................... 1

*Maverick Tube Copr. V. United States*, No. 14-00229, 2015 Ct. Int'l Trade LEXIS 60 (Ct. Int'l Trade 2015) ................................................................................................................................... 21

*Nucor Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (Ct. Int'l Trade 2022) ......................................................................................................................................................... 4

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ...................................... 21

## Statutes & Regulations

19 C.F.R. § 351.509 ......................................................................................................................... 9

19 C.F.R. § 351.510 ......................................................................................................................... 9

19 C.F.R. § 351.511 ..................................................................................................................... 8, 14

19 C.F.R. § 351.525(b)(6)(iv) .......................................................................................................... 3

19 U.S.C. § 1677(5)(D)(ii) ............................................................................................................... 8

19 U.S.C. § 1677(5)(E)(iv) ............................................................................................................ 14

19 U.S.C. 1677(5A)(D)(ii) ............................................................................................................ 20

**Administrative Decisions & Publications**

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review and Rescission of Countervailing Duty Administrative Review, in Part*; 83 Fed. Reg. 32,840 (July 16, 2018)...................................... 6

*Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020) ........................................................ 7

*Certain Softwood Lumber Products from Canada: Final Results of Countervailing Duty New Shipper Review*, 70 Fed. Reg. 56,640 (Sept. 28, 2005)............................................................. 15

*Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021)................................................................... 15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) .............................................................................. 14

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission , in Part*; 88 Fed. Reg.  34,129 (May 26, 2023)  18, 19

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind in Part*; 87 Fed. Reg. 73,750 (Dec. 01, 2022)..................................................................................................................... 18

*Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part*; *2014*, 81 Fed. Reg. 89,057 (Dec. 9, 2016) ........................................................................................... 8

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") submits this Reply Brief in response to the Response Briefs filed by the Defendant United States (the "Government") and Defendant-Intervenors Rebar Trade Action Coalition *et al*. (collectively, "RTAC") on April 6, 2023 (referred to as "Def. Br." and RTAC Br.", respectively).  For the reasons outlined below, the Court should reject the arguments presented by these briefs in full.

## ARGUMENT

**I.     THIS COURT'S DECISION IN *KAPTAN I* NECESSITATES A REMAND ON THE CROSS-OWNERSHIP ISSUE**

In their response briefs, the Government and RTAC present the same cross-ownership arguments they made in Kaptan's appeal of the 2018 CVD review – *Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Ct. No. 21-00565 ("Kaptan I") –without deviation. As before, they argue that Commerce correctly found that Nur Gemicilik ve Tic. A.S. ("Nur") is not a cross-owned input supplier by relying on two points: (1) the scrap was used in the production of subject merchandise; and (2) all of Nur's scrap generation was sold to Kaptan. Def. Br. at 9-18; RTAC Br. at 8-14.  They argue that these facts alone are sufficient for a lawful finding that Nur's scrap production is "primarily dedicated" to the downstream product.  *Id*. This Court rejected this position in *Kaptan I* in Slip Op. 23-62, issued shortly after the filing of the parties' response briefs.  The Court should do the same here; there are no new facts[1] in this review that would require a different determination from the Court.

---

[1] The figures related to both Nur's overall sales and Nur's sales to Kaptan are slightly but not materially different than the previous review. *See* Kaptan Br. at 5-6.  In both instances Nur's scrap sales represent less than 1% of the company's overall sales and less than 0.01% of Kaptan's scrap purchases.

A.   *KAPTAN I*

In *Kaptan I,* this Court concluded that "Commerce has not offered a satisfactory explanation on the cross-owned input supplier issue and the primarily dedicated analysis."  Slip Op. 23-62 at 6.  In rendering this opinion, the Court rejected Commerce's "only one substantive reason for its decision":

> Regardless of the amount of steel scrap manufactured by Nur and regardless of the fact that it was manufactured as a byproduct rather than as Nur's primary production activity, as previously stated, <u>steel scrap has been found, in previous segments of this proceeding to be a product that is primarily dedicated to the production of downstream steel products.</u> Nothing Kaptan argues changes that fact.

*Id*. at 6, quoting from 2018 CVD IDM at 27 (emphasis in original).  Commerce's decision in this review had the same conclusion ***verbatim***.  Final IDM at Cmt. 1 (**PR 176**).  In rejecting this verbatim conclusion, the Court found reliance on previous segments and the decision in *Icdas Celik Enedi Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ("Icdas") "misplaced."  Slip Op. 23-62 at 6. The Court explained:

> In the prior segments, the determinations were made with respect to different companies within the Kaptan group. These determinations did not involve Nur, nor the specific factual circumstances surrounding Nur's generation of scrap and the sale of these products to Kaptan, and the use of the inputs in Kaptan's productions. Likewise, Icdas only involved the specific factual circumstances of a different entity, Içdaş Elektrik, selling scrap to Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. Icdas, 498 F. Supp. 3d. at 1363-64. Icdas does not stand for the proposition that all cross-owned vendors of scrap, by definition, would be considered a supplier of input primarily dedicated to the production of steel products. Commerce needs to explain further why the input product in question, i.e., scrap metal generated by Nur, is in fact primarily dedicated to the production of downstream products in this case. This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject merchandise

*Id*.  This finding is consistent with other recent decisions on the "primarily dedicated" issue.

2

**B.** *GUJARAT*

In *Gujarat Fluorochemicals Ltd. v. United States,* 617 F. Supp. 3d 1328, 1335 (Ct. Int'l Trade 2023) ("Gujarat"), the issue was whether an affiliated electricity supplier whose sole customer was the respondent rose to the level of cross-ownership through the "primarily dedicated" language in 19 C.F.R. § 351.525(b)(6)(iv). In rejecting Commerce's finding that it did, the court goes through a similar analysis to the regulation as the one Kaptan presented to this Court in its opening brief at 17-20. In focusing on the *Preamble* and the examples provided therein, the court found:

- "whether an input is 'primarily dedicated to the production of the downstream product' does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a 'link' in the production chain." *Id*. at 1336.

- "Ignoring the distinction the Preamble draws between an upstream product that is merely a link in the production chain of a higher value-added product and one that is not, Commerce mistakenly thought it sufficient that 'IWL's wind energy generation during the POI was provided expressly for the purpose of providing electrical energy to GFCL and had no other purpose outside of GFCL's overall production chain.' *Final I&D Mem*. at 12." *Id*.

- "The plastics example in the Preamble language instructs, further, that Commerce will apply 19 C.F.R. § 351.525(b)(6)(iv), as opposed to an upstream subsidy analysis, when the physical relationship between the input and the downstream product makes it 'reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product.'" *Id*. at 1338.

In the instant appeal, Commerce found that it "disagree{s} that the supplying affiliated company's primary business activity is a determinative factor in this case, or even in most cases. In this review, there is no question that Nur generates the steel scrap during its ship production. . . . in this instance, the record information shows that Nur sold the steel scrap exclusively to Kaptan, thus providing to Kaptan a supply of scrap devoted to Kaptan's downstream steel production ion." Final IDM at Cmt. 1 (**PR 176**). While Commerce also

3

found that "steel scrap has been found, in previous segments of this proceeding to be a product that is primarily dedicated to the production of downstream steel products" it refused to analyze the facts present in this case to make that determination in a manner consistent with *FEBs*, *CTL Plate from Korea* and now *Gujarat*.

### C. *NUCOR*

Commerce conducted a similarly fulsome primarily dedicated analysis as the one advocated for in *Gujarat* in its January 31, 2023, Final Results of Redetermination Pursuant to Court Remand ("*Nucor Remand*") in *Nucor Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (Ct. Int'l Trade October 5, 2022) ("Nucor").[2] *Nucor* is relevant because Commerce's analysis of whether Plantec's scrap was primarily dedicated to the respondent's production is at odds with Commerce's analysis in the instant case.  In the *Nucor Remand*, Commerce continued to find that Plantec's scrap was not primarily dedicated to respondent's steel production.

The *Nucor Remand* is relevant to this case for several reasons.  **First**, Commerce outlines and clarifies the criteria it looks at for its primarily dedicated analysis:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

_____

[2] Ct. No. 21-00182, ECF #61. The court has not issued its opinion on these remand results as of the date of this filing.

PUBLIC VERSION

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input an downstream products."

Nucor Remand at 26, 59. Commerce explained that "Commerce's decisions in this case do not depend on the outcome of a single controlling factor or fact, but involve a holistic analysis of the facts on the record of this proceeding." *Id*. at 66. Commerce then specifically noted that "We disagree with Nucor's assertion that an input supplier's business operations are irrelevant in determining whether an input is a primarily dedicated input" and that "Commerce's case history clearly demonstrates that we have previously examined the business operations of input suppliers; in the draft remand redetermination, we discussed *Glass Containers from China* and *FEBS from Germany* as examples." *Id*. at 63. This is **not** the analysis Commerce conducted in the challenged review here.

    **Second**, Commerce has a detailed discussion of the nature of scrap that is again missing from the instant case. Commerce explains:

> there is no debate among the parties that POSCO Plantec generated the scrap and that the scrap in question can be, and was in fact, used in the production of downstream product. However, . . . unprocessed scrap is a common input among a variety of products and industries and generated as a byproduct during a variety of production processes. To further explain this finding, we can compare the scrap provided by POSCO Plantec with the scrap processing services provided by POSCO's cross-owned input supplier, . . . (Pohang SRDC). POSCO Plantec generated the scrap as a byproduct in its production processes, and it did not alter or otherwise process the scrap it generated for use as a steel input or specifically in the production of POSCO's downstream product. Furthermore, no parties argued, and the record did not demonstrate, that the steel scrap in question was not a generic scrap input that could be used in the production of many products. This is in contrast with Pohang SRDC, which Commerce examined as a cross-owned input supplier in this case, as the record

PUBLIC VERSION

> demonstrates that Pohang SRDC *processed* scrap by means such as loading and unloading, storage, guillotining (cutting), pressing to adjust size, etc., on behalf of POSCO Daewoo Corporation (PDC), which then provided the processed scrap to POSCO. The scrap provided by Pohang SRDC was processed in a way that was specifically repurposed for POSCO's steel production.

*Id*. at 27-28.  Commerce further noted that "similar to plastic, unprocessed scrap is a common input among a variety of products and industries and generated as a byproduct during a variety of production processes."  *Id*. at 60.  Indeed, "Commerce has never made a finding that scrap is always primarily dedicated to the production of steel."  *Id*. at 58.

### D.   SUMMARY

These cases collectively demonstrate that the nature of the input supplier's production is a key consideration to the "primarily dedicated" analysis.  In each of the cases outlined above, and the ones cited to and discussed in Kaptan's Brief at 12-17, Commerce found that scrap input sales to the respondent –even where used in the production of subject merchandise – were not sufficient to find the input primarily dedicated because of the nature of the input supplier's business activities.  In these cases, Commerce specifically rejected an "exclusivity" standard whereby the primarily dedicated standard would always be satisfied if all of the producer's input was sold the respondent.  Yet such rationale comprises the exact the basis for Commerce's finding in this case.  Ultimately, Commerce concluded that because Nur sold all of its scrap to Kaptan during the POR, that Nur's "production" was dedicated almost exclusively to the downstream product.  In rejecting such an analysis, Commerce explained in the cases above that "Commerce did not set an 'exclusivity standard or requirement . . . . Rather, in deciding whether to attribute subsidies received by {the input supplier} to {the respondent}, Commerce examine{s the inputs supplier's}business activities on the record, followed the guidelines mentioned above."  *CTL Plate from Korea 2018* at IDM Cmt. 2.

PUBLIC VERSION

In following the guidelines Commerce has established, the following critical facts are highly relevant to this inquiry: Nur's business is shipbuilding and port services. Kaptan Initial Questionnaire Response at 8 (**PR 77/CR 42**). This industry is completely distinct from, and has no connection to, subject merchandise or steel production in general.[3] Indeed, evidence on the record demonstrates that this is a very miniscule by-product to Nur's production and that this scrap purchase from Nur was a very miniscule component of Kaptan's production:

(1) the sale of scrap represented [    ] of Nur's sales of all products during the period of review ("POR"). Kaptan Supp. Affiliation Response at 1 (Apr. 22, 2021) (**PR 40/CR 8**).

(2) Nur does not supply Kaptan with scrap on a regular basis. The company has been in business since 2005. Kaptan Initial Questionnaire Response at 8 (**PR 77/CR 42**). Kaptan had been involved in four CVD reviews prior to the challenged review and this is the second year in which Nur sold scrap to Kaptan.

(3) Nur sold [    ] of the scrap Kaptan purchased during the POR. Kaptan Affiliation Response at 5 (March 30, 2021) (**PR 29/CR 6**). This miniscule amount of scrap was used for both subject and non-subject merchandise.[4]

Ultimately, the question Commerce should be asking, as it did in *CTL Plate from Korea 2018*, *Gujarat* and *Nucor*, is whether the purpose of a subsidy provided to Nur is to benefit the production of Kaptan's steel products. Nur is a ship builder that may or may not have scrap generation and sales during a given year. Nur began in 2005 and the alleged land subsidy the company received was in 2014. While the record is not clear whether Nur had scrap sales during this year, the fact that Kaptan was a mandatory respondent in the 2014 administrative review of this CVD Order and did not report Nur as a cross-owned scrap supplier demonstrates that scrap

---

[3] *See Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), IDM at Cmt. 12.
[4] Kaptan Initial Questionnaire Response at 9 (**PR 77/CR 42**).

sales did not exist between the companies.[5]  Moreover, that ship and fishing vessel construction is not generally thought of as a scrap generation industry (ships are often made of fiberglass and other materials).  With the scrap sales so small during the POR, combined with the fact that the scrap purchases were such a minor portion of Kaptan's overall scrap purchases, one cannot reasonably conclude that the purpose of a subsidy provided to Nur is to benefit Kaptan's steel production.  As a result, Nur should not be considered a cross-owned input supplier of Kaptan and its subsidies should not be attributed to Kaptan.

## II.     THE GOVERNMENT'S AND RTAC'S ARGUMENTS ON NUR'S LAND RENT EXEMPTION FAIL

### A.  NUR WAS EXEMPTED FROM PAYING RENT/FEES; THIS IS REVENUE FOREGONE

In its brief, the Government argues that Commerce properly consider Nur's exemption from paying rent as a good for less than adequate remuneration ("LTAR") under 19 C.F.R. § 351.511 rather than revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).  Def. Br. at 19-21; RTAC Br. at 14-19.  The only support the Government provides for this claim is that it considers the agreement to create a "conditional easement." Def. Br. at 20.  Like Commerce in the underlying proceeding, the Government does not present any legal basis, or precedential support, for the claim that "conditional easements" (or however one frames the land use agreement at issue here) are subject to an LTAR analysis rather than a revenue foregone analysis.  *See* Def. Br. at 18-21. There is no meaningful distinction between a lease and "conditional easement" for purposes of this analysis.

---

[5] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part*; *2014*, 81 Fed. Reg. 89,057 (Dec. 9, 2016) (Nur was not a cross-owned affiliate in this review) (unchanged in final).

In its brief, the Government first states that: "Because the terms of the contract depict a conditional easement, the application materials describe the agreement as a free easement or free usage permit, and the Turkish government described the program as a free use permit rather than an exemption from lease payments, it is clear based on the facts on the record that this program provided a good for LTAR under 19 U.S.C. § 1677(5)(D)(iii)." Def. Br. at 20. The Government then concludes that "rather than being required to pay rent to use the land, as would be the case under a lease, Nur instead was given an easement to use the land conditioned on the fulfillment of certain other obligations. In providing the land, the Turkish government provided a good, in the form of land, for less than adequate remuneration under Law 5084." *Id*.   After making this statement, the Government admits that both discounts and exemptions on lease terms are analyzed under the revenue forgone provisions. *Id*. at 21. However, the Government's position is that the nature of this agreement lends itself to an LTAR analysis rather than a revenue foregone analysis.  This position is without merit.

The revenue foregone provisions address circumstances where the government authority sets an amount owed – taxes, fees, rent for government owned land/buildings, etc – which is then exempted or reduced.  *See, e.g*., 19 C.F.R. §§ 351.509, 351.510.  The benefit represents the amount that would otherwise be owed to the government *but for* the exemption or reduction. In Kaptan's brief, we identified a number of cases where the foreign government either exempted rent from government-owned land or offered rent reductions.  Kaptan Br. at 26-27.  In each of these cases, Commerce considered the program under the revenue foregone provision.  The Government does not dispute this precedent in its brief.

Rather than address these cases, the Government's position is that Nur's arrangement should be viewed as a contingent easement which somehow converts the situation into Nur receiving a "good" from the government rather than Nur not having to pay money to the

government that were otherwise owed.  The Government states that because Nur was "given an easement to use the land," "the Turkish government provided a good, in the form of land."  Def. Br. at 20.  Yet neither the Government nor Commerce provides the definition of an "easement" in this context or why it creates the provision of a "good."

The absence of any further explanation highlights a number of errors with this analysis. First, the agreement between Nur and the government only permits Nur to use and develop the land for a temporary period of time.  This is an identical characteristic to the defining nature of lease and it is the exact opposite of the purchase of a good.  In contrast, the purchase of a good is typically the retention of the sole and exclusive ownership of an item *ad infinitum*.  A key characteristic of the purchase of a good is that one is not required to return the good.  In contrast, a key characteristic of a lease (or of the temporary use of good) is that the good must be returned. Thus, to own the good, it is being purchased, while to use the good temporarily, a fee is being charged.  *See* Kaptan Br. at 27-28 (providing definitions).

Second, not only does the Nur agreement set a finite time period to use the good, but it also outlines the terms and consideration for that usage and the fee that would be charged if the terms are not met. In other words, the agreement indicates that Nur can use the land regardless of whether the terms and conditions are met but that if they are not met, usage fees are owed to the government: [

PUBLIC VERSION

]⁶

The existence of the right of use fee (*i.e.*, the fee that would be charged and has been exempted) could not be clearer.

Third, the land was provided pursuant to Law 5084.  This law provides for the usage of government land exempt from applicable fees if certain investment conditions are met.  Nur's agreement mirrors this law and sets forth the fees that are exempt if the investment conditions are not met.

Taken together, the record evidence very clearly establishes a term lease-like arrangement whereby Nur is permitted to use and develop government land free from government fees. The record further establishes the fees that would be owed to the government if certain conditions are not met.  The conditional nature of this arrangement is consistent with other types of exemption programs – *e.g.*, obtaining lower tax rates for being located in certain areas or for certain types of production.  The conditional nature of this arrangement does not alter the fact that the arrangement is an exemption from government fees rather than a purchase of a good.  Indeed, the agreement outlines the fee that would be owed for "right to use" if the

---

⁶ Kaptan IQR at Exh. 31, Art. 16 (**CR 42, CR 58, PR 77**).

conditions are not met.  Because the facts fall squarely within the revenue foregone provisions rather than the LTAR provisions, the revenue foregone analysis applies.

The remaining arguments made by RTAC are similarly unavailing. RTAC argues that "Congress specifically identified two kinds of programs pursuant to which a government authority forgoes revenue, namely "tax credits" and "deductions from taxable income." Def. Br. at 15. However, this ignores prior cases in which the Department has found discounts and exemptions from lease terms to be "revenue foregone," a fact that the Department itself concedes in its brief. Def. Br. at 21 ("{i}t is true that Commerce has previously found discounts and exemptions from lease terms to be revenue foregone pursuant to section 19 U.S.C. 1677(5)(D)(ii)").

Although the agreement very clearly outlines the fee that would be owed for "right to use" if the conditions are not met, RTAC attempts to characterize this as a "penalty" rather than a "market-based lease rate." However, there is no justification for RTAC's characterization in the record, and RTAC's attempts to characterize the fee as a "penalty" is conjectural.

RTAC argues that an LTAR analysis is required where the amount of rent is not known, RTAC Br. at 19, and "the amount of rent that the GOT would have accepted . . . is not specified…" RTAC Br. at 19. However, in making this claim, the RTAC ignores and mischaracterizes a key provision of the Agreement that does just this. RTAC argues there is "no reason to assume that the GOT would have leased the land at the value" specified, but there is no basis for RTAC's supposition that this is not the case. The information on the record clearly provides exactly the amount required by the GOT if the terms of the agreement are not met.

Finally, RTAC's arguments are largely irrelevant as none of the reasons they cite formed the basis of the Department's actual decision in the Final Results, and thus are nothing more than

post hoc rationalizations. In the Department's Final Results, the only support the Department

cited for its determination that a "conditional easement" is not treated as "revenue foregone" was

the Final Results from the 2018 proceeding: "In *Turkey Rebar 2018 Final Results* we found that

the agreement between Nur and the local authority is not a lease, and does not outline a lease

term but, instead, is a right to use land conditioned on fulfillment of obligations. The GOT

confirmed that no changes were made to this program, and that it was not replaced with a

successor program. Thus, we find that the cases cited by Kaptan are inapposite to the facts here

and, therefore, we continue to find that the Land for LTAR Under Law 5084 Program constitutes

a financial contribution under section 771(5)(D)(iii) of the Act in the form of the provision of a

good." Final IDM at Cmt. 2 (**PR 176**). As the Court is aware, this decision is under appeal and

was recently remanded to the Department to reconsider its cross-supplier analysis. As the Court

is still deciding whether the Department's analysis in that case was supported by substantial

evidence and in accordance with law, it is not reliable precedent for the Department's decision in

this case.

### B.   ADJUSTMENTS TO THE BENCHMARK SHOULD HAVE BEEN MADE

As a threshold matter, it is notable that in their Response Briefs (and in the

Department's IDM), the Government and RTAC essentially ignore Kaptan's arguments about

the problems with using data placed on the record by Petitioner to calculate the benefit received

by Kaptan for receipt of rent-free land. Their failure to address Kaptan's arguments should be

recognized as a tacit admission that the data placed on the record by Petitioner are, in fact,

deficient. Instead of addressing Kaptan's arguments, both the RTAC and Government instead

focus on a number of (unsubstantiated) reasons as to why Kaptan's proposed alternatives are

inadequate. Def. Br. at 21-22, RTAC Br. at 20-22. The Government's and RTAC's arguments

are entirely without merit and, if the Court affirms the Department's calculation of the benefit

as LTAR rather than revenue foregone, the Court should issue a remand requiring the Department to adjust the benchmark.

As explained in Kaptan's direct brief, in the Final Results, the Department selected a land benchmark based on Petitioner's submission of benchmark data. This benchmark consisted of rental prices contained in a 2020 Colliers International's Real Estate Market Turkey Review Report ("CBRE Report").[7] The rental prices were for eight different localities that were listed in the section of the Report called "industrial and logistical facility rent." Petitioner Benchmark Submission at Exh. 1 (**PR 136**). Because these rental prices covered the use of land *and* facilities, they are inappropriate to use as the benchmark for Nur's land (which is exclusive of the facilities that Nur developed and built on the land).

The selection of benchmarks is governed by 19 U.S.C. § 1677(5)(E)(iv). This provision instructs Commerce to determine the adequacy of remuneration "in relation to the prevailing market conditions for the good." The statute goes on to define "prevailing market conditions" to include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* In addition, Commerce must evaluate "factors affecting comparability" in selecting the proper benchmark under 19 C.F.R. § 351.511 and 19 U.S.C. § 1677(5)(E)(iv). To comply with these benchmark selection criteria, Commerce seeks to select the most products specific benchmark possible for use in LTAR calculations in accordance with its well-establish practice that includes:

- *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM at Cmt. 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product.");

---

[7] Final IDM at Cmt. 2 (**PR 176**).

- *Certain Softwood Lumber Products from Canada: Final Results of Countervailing Duty New Shipper Review*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), IDM at Cmt. 1 (selecting a region-specific benchmark in order to "conduct the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices").

Kaptan's opening brief outlined several cases where Commerce applied these same criteria to the selection of "tier 2" land benchmarks. Kaptan Br. at 33. Specifically, for example, in *Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 8, 2021), IDM at Cmt. 4. Commerce found that petitioner's benchmark, which included land and warehouse rent, was inappropriate to compare to the respondents' land-only rent. The Government and RTAC in their briefs are silent with regard to these cases and their clear relevance here. By using a benchmark that includes both land and buildings, Commerce greatly inflated the benefit Nur received from this program, thereby inflating the CVD rate applied. Indeed, in doing so, Commerce found that Nur's use of its own facilities (which it constructed itself) to result in a countervailable benefit. This is unsupported by substantial evidence and unlawful. As explained in Kaptan's brief, Kaptan provided sufficient information on the record of the underlying review that would permit Commerce to adjust the rental benchmark to make it a land rent to land rent comparison. Kaptan Br. at 40-42. Commerce's failure to use or address this information necessitates a remand on this issue.

The Government and RTAC's attempts to undermine the alternatives proposed by Kaptan are unavailing. First, the Government and RTAC argue that Kaptan's first alternative option – i.e.., the use of "easement fee" set forth in the contract – and its third option of adjusting Petitioner's land rental benchmark by the rental ratio outlined in Nur's land contract -- are not acceptable because the agreement does not constitute a lease. Def. Br. at 22, RTAC Br. at 20.

However, as discussed above and in Kaptan's direct brief, the Government's and RTAC's arguments are unconvincing because the land use agreement at issue meets all the required elements of a lease, and neither the RTAC nor the Government have pointed to any support suggesting that it does not meet the definition of a lease.

With regard to Kaptan's proposed second alternative – using proposed land rental prices obtained from the Turkish government's website – the Government states merely that there are "no details on how it carried out the provision of the land to the land's recipients" and "prices from a government auction is in appropriate where independent rental benchmarks were provided on the record by the petitioner." Def. Br. at 22. However, this reasoning is entirely irrelevant. The information on the record demonstrates that the government website presents opportunity for competitive bidding, is open to the public, confidential, and based entirely on price. Kaptan Br. at 35-36. Thus, any details that are purportedly not provided are irrelevant as the information on the record demonstrates that the government website is a competitively run government auction.[8]

The Court should issue a remand requiring the Department to reconsider Kaptan's arguments that it is inappropriate to use the rental benchmarks provided by Petitioner given the fact that they cover the use of land and facilities, while Nur's land is exclusive of the facilities that Nur developed and built on the land, as the Department entirely failed to do so in its Final Results.

---

[8] The other reasons cited by RTAC (e.g., the land at issue was advertised for commercial, rather than industrial, use and [                              ]), are not justifications provided by the Government in its Final Results, and therefore irrelevant.

### III. THE GOVERNMENT'S AND RTAC'S ARGUMENTS THAT KAPTAN FAILED TO EXHAUST ARGUMENTS CONCERNING THE BITT EXEMPTION PROGRAM ARE MERITLESS

The Government and RTAC argue that Kaptan failed to exhaust its administrative remedies because, although Kaptan raised the issue that "the industrial registry certificate can be obtained by any industrial establishment, Kaptan failed to develop that argument before Commerce, depriving the agency of its ability to respond to the argument Kaptan attempts to develop here." Def. Br. at 28. The Government's and RTAC's arguments concerning exhaustion are entirely without merit and should be dismissed.

As an initial matter, Kaptan notes that "'the Court of International Trade ... enjoys discretion to identify circumstances where exhaustion of administrative remedies does not apply.'" *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019), *citing Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003) (citations omitted). Further, the Court has also recognized that parties cannot be expected to exhaust issues or arguments that were not raised by parties or the agency at that point. *See, e.g., Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334, 1353–54 (Ct. Int'l Trade 2020) ("*Boomerang* does not require parties to anticipate issues that have not been raised by a party or the agency at that point.").

In its Preliminary Results, the Department's analysis of this program consisted only of the following three-sentence paragraph, with only a single sentence spent on its finding of specificity:

> *We also find that this program is specific under sections 771(5A)(D)(i) and (iv) of the Act, because, as discussed above, the program is limited to firms that conduct certain types of foreign exchange transactions that were exempted by Law 6802 (Article 33) (the Expenditure Expenses Law).*

*See* Preliminary Decision Memorandum at 12 ("3. Exemptions from Bank and Insurance Transactions Tax on Foreign Exchange Transactions") (emphasis added). In its administrative

case brief, Kaptan addressed the Department's position and analysis *as it existed in the Preliminary Results*, which itself only referenced 771(5A)(D)(i) and (iv) of the Act. Kaptan explained:

> ***First, generally, the program is not limited to certain types of foreign exchange transactions***. According to the law, the bank and insurance transactions tax on foreign exchange transactions only applies to foreign exchange sales. ***GOT NSA Response at 1-11 (August 19, 2021). In other words, whether the BITT is applicable or exempted, it only applies to foreign exchange sales (e.g., like a general sales tax). Thus, the nature of the BITT already limits the universe of potential applicable companies since only companies that have foreign exchange sales must pay BITT. Second, the program is not limited to certain companies.*** The GOT in its New Subsidy Allegations Response at 2 states that "With this regard, foreign exchange sales that are made to any enterprise having an industrial registry certificate are subject to 0% BITT rate without any exceptions. Industrial registry certificate can be obtained by any industrial establishment." ***If any industrial company in Turkey can obtain an industrial registry certificate, the program cannot be defined as "expressly limit{ed}" as a matter of law and therefore this exemption is not countervailable***.[9]

Notably, no other party briefed this issue in its administrative case briefs, thus there was no opportunity or reason to address this issue further in Kaptan's rebuttal briefing. Although RTAC raised several arguments in its rebuttal brief, there was no opportunity for Kaptan to address these prior to the Department's issuance of its Final Results.

In the Final Results, Commerce then provided a much lengthier analysis raising additional arguments and issues it had not previously raised or considered in the Preliminary Results.[10] First, the Department stated "Kaptan claims that the BITT tax is limited to firms which have foreign investment transactions, which narrows the universe of all enterprises to just those that have had foreign transactions. While the BITT tax only applies to those firms that make

---

[9] Kaptan Case Br. at 23 **(CR 119, PR 164)** (emphases added).
[10] Final IDM at Cmt. 3.

foreign exchange transactions, this is not the basis for our finding of specificity."[11] Citing to two presidential decrees, the Department then further explained: "we continue to find that the applicable law expressly limits the exemptions to companies or enterprises that satisfy at least one of five conditions specified in the law."

Then, addressing Kaptan's point that "industrial registry certificate can be obtained by any industrial establishment," the Department argued for the first time in the Final Results as follows:

> However, **the GOT did not further define the parameters under which it defines "industrial establishments" or identify and explain the criteria under which it grants or denies industrial registry certificates. The GOT's statement that an industrial registry certificate can be obtained by any industrial establishment is not a basis on which to conclude that the GOT does not limit the BITT exemption to specific enterprises**.

> Further, Kaptan reported being eligible for this BITT rate exemption because it was a part of an exporters association, not because it had an industrial registry certificate.85 Thus, Kaptan's own argument that the industrial registry certificate requirement makes the exemption widely available does not even apply in Kaptan's situation, as Kaptan did not disclose whether it possesses an industrial registry certificate, and reported being eligible for the exemption under a different condition.

Although the Department adopted arguments made by Petitioner in its rebuttal brief, because the arguments were made only in Petitioner's rebuttal brief and in the Department's Final Results, Kaptan had no opportunity to address them in earlier briefing. As such, the exhaustion doctrine does not apply in this circumstance. In essence, it was the Department that "took a second bite of the apple" in its Final Results by providing new arguments and analysis that left no opportunity for comment at the administrative level by Kaptan.

----

[11] *Id.*

19

For example, specifically, the Department stated in its Final Results for the first time: "the GOT did not further define the parameters under which it defines "industrial establishments" or identify and explain the criteria under which it grants or denies industrial registry certificates."  Kaptan's briefing before the Court therefore does not constitute new issues or arguments raised for the first time on appeal, but rather demonstrates why the Department's Final Results are unsupported by record evidence. Kaptan's arguments regarding 19 U.S.C. § 1677(5A)(D)(ii) and the fact that all Turkish enterprises are required "to obtain industrial registry certificates" were simply a response to arguments raised by the Department for the first time in the Final Results, to which Kaptan had no previous opportunity to respond, and were demonstrably untrue based on record evidence.

Further, even in its administrative case brief, Kaptan cited to the GOT's NSA Response at 1-11,[12] which are the portions of the record that Kaptan cited to again in its direct brief before the Court to support its position. Thus, Kaptan's arguments did not involve new record evidence that was not previously considered by the Department at the administrative level.

Thus, Kaptan's position in this case is distinct from the cases cited by the Government and RTAC. In *Boomerang Tube LLC v. United States*, 856 F. 3d 908 (Fed. Cir. 2017), the parties had an opportunity to provide rebuttal briefs on the specific issue on appeal and failed to do so:

> *It is also undisputed that, in its case brief, JESCO suggested using those data to calculate CV before Commerce. At that point, Boomerang and U.S. Steel had notice of the potential that Commerce might use the Colombian data to calculate JESCO's CV profit*. Indeed, Boomerang's rebuttal brief to Commerce reveals that it recognized JESCO's suggestion to use the Colombian data for CV profit and that Boomerang objected to that approach. *Unfortunately for Boomerang, its rebuttal brief made no*

---

[12] Kaptan Case Br. at 23 **(CR 119, PR 164)**.

> ***mention of its current argument that the affiliated Colombian entity
> should be collapsed into the Duferco ent***ity. As such, the argument was
> not exhausted before Commerce and should not have been considered by
> the Trade Court.

*Id*. at 913 (emphases added). Similarly, this case is distinct from *Rhone Poulenc*. In that case, the

Court explained:

> The CIT found, and Rhone Poulenc does not dispute, ***that it did not raise
> the adjustment arguments before the ITA "for tactical reasons***." 710
> F.Supp. at 348; 710 F.Supp. at 350. Far from it being unjust to Rhone
> Poulenc, it would have been unjust to the ITA and wasteful of public
> resources to allow Rhone Poulenc to belatedly raise the argument under
> these circumstances.

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). In contrast, in this

case, there is no concern that Kaptan deliberately failed to raise an argument before the

Department for tactical reasons. Rather, this was Kaptan's first opportunity to respond to new

arguments raised in the Final Results. Further, it was Kaptan's first opportunity to demonstrate

how the Department's Final Results were unsupported by substantial record evidence, which it

did actually cite to in its administrative case brief. Kaptan was not "fleshing out its arguments,"

as the Maverick was in *Maverick Tube Copr. V. United States*, No. 14-00229, 2015 Ct. Int'l

Trade LEXIS 60, at *10-12 (CIT June 15, 2015). Rather, at the time it submitted its case brief,

Kaptan fully addressed the Department's arguments as they existed in the Preliminary Results. It

was the Department that "fleshed out its arguments" for the first time in the Final Results,

leaving no further opportunity to respond at the administrative level.

   The RTAC also argues that, exhaustion issue aside, Kaptan did not claim to have

qualified for the BITT exemption on the basis of possessing an industrial registry certificate and

submitted no such certificate for the record. RTAC Br. at 24. This, again, is a point raised by the

Department for the first time in its Final Results, and is irrelevant because it was not previously

PUBLIC VERSION

at issue. Further, the Department noted itself in the Preliminary Results: "Colakoglu and Kaptan reported that they were eligible to receive this tax exemption because they possess an industrial registry certificate or are a part of an exporters' association."[13]

For these reasons, the Court should find that the Government's and RTAC's arguments on this issue are meritless, and should remand this issue back to the Government in accordance with Kaptan's 56.2 motion and brief.

## **CONCLUSION**

Kaptan requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  June 29, 2023

---

[13] Preliminary Decision Memorandum at 11-12 (**PR 148**).

PUBLIC VERSION


## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiff's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 6,914, less than the 7,000-word limit.


<u>/s/ Andrew T. Schutz</u>

Andrew T. Schutz

*Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

Dated: June 29, 2023