UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN

|  |  |  |
|---|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S. | : : : | |
| Plaintiff, | : : | |
| and | : : | |
| v. | : : | Court No. 22-00149 |
| UNITED STATES, | : : : | |
| Defendant, | : : | |
| and | : : | |
| REBAR TRADE ACTION COALITION, *et al*., | : : | |
| Defendant-Intervenors. | : : | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

On October 24, 2023, the Court issued an order for supplemental briefing asking that the parties comment on "the bearing on this case of Commerce's Final Results of Redetermination Pursuant to Court Remand Order, *Kaptan Demir Celik Endustri ve Ticaret A.S. v. United States* (Kaptan I), No. 21-565 (CIT July 24, 2023), ECF No. 66, as well as the United States' response to comments on those results, see Defendant's Response to Comments on Remand Results, *Kaptan I*, No. 21-565 (CIT Sept. 22, 2023), ECF No 72." As outlined below, Commerce's, and the Court's, decision in *Kaptan I* has a direct and precedential bearing on the Court's determination on most of the issues in the case (hereinafter *Kaptan II*), including the primary issue – whether or not Nur is a cross-owned input supplier. As a result, the Court should pause this proceeding until it has rendered its decision on the remand results in *Kaptan I*. After that

1

decision, the Court should consult with the parties in this case to determine the best way to proceed.

**1.     *Kaptan I* and *Kaptan II* Involve the Same Claims**

*Kaptan I* and this proceeding, hereinafter *Kaptan II*, have almost the same claims:

| *Katpan I* | *Kaptan II* |
|---|---|
| 1. Commerce unlawfully found Nur Gemicilik ve Tic. A.S. ("Nur") was a cross-owned input supplier. Complaint at 5, ¶¶ 15-16. | 1. Commerce unlawfully found Nur was a cross-owned input supplier. Complaint at 5, ¶¶ 16-17 |
| 2. Commerce unlawfully found that Nur's rent free land was regionally specific. *Id.* at 6, ¶¶ 17-18. | 2. Commerce unlawfully calculated the benefit for Kaptan's rent free land as a good for less than adequate renumeration. *Id.* at 6, ¶¶ 18-20. |
| 3. Commerce unlawfully calculated the benefit for Kaptan's rent free land as a good for less than adequate renumeration. *Id.* at 6, ¶¶ 19-21 | 3. Commerce unlawfully selected an industrial rent benchmark taken from a Colliers International Real Estate Report for Turkey for 2019 to calculate the benefit for the land rent program. *Id.* at 6, ¶¶ 21-23 |
| 4. Commerce unlawfully selected an industrial rent benchmark taken from a Colliers International Real Estate Report for Turkey for 2018 to calculate the benefit for the land rent program. *Id.* at 6-7, ¶¶ 22-24 | 4. Commerce unlawfully found the Exemptions from Bank and Insurance Transactions Tax on Foreign Exchange Transactions to be specific. *Id.* at 6, ¶¶ 24-26. |

Claim 2 in *Kaptan I* was dropped by Kaptan and, thus, the only difference in terms of claims between the two proceedings is Claim 4 in *Kaptan II*. Claim 4 is unrelated to and not impacted by a decision on whether Nur is a cross-owned input supplier. In contrast, as the Court correctly acknowledged in Slip Op. 23-62 at n. 4 when it did not render a decision on Plaintiff's Claim 3 and 4, "the other arguments raised by the parties as the arguments are contingent on the court upholding Commerce's finding that Nur was a cross-owned input supplier." In sum, this side-

by-side comparison confirms that the main issue in each case is whether Nur is a cross-owned input supplier.

**2.     In *Kaptan I*, Commerce Reversed Its Decision that Nur Was a Cross-owned Input Supplier**

In the *Kaptan I* Remand Results, Commerce reversed its decision that Nur was a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).  Commerce explained:

> "primarily dedicated" normally involves an analysis of both the input supplier's entire production (i.e., the nature of the supplier's operations) and input production itself and its relationship to downstream products (i.e., nature of the input). These concepts are reflected in the discussed factors in our analysis relating to whether a product is "merely a link in the overall production chain" and an input supplier's business activities. . .
>
> unprocessed scrap is a common input among a wide variety of products and industries, as plastics are to automobiles, and thus, not the type of input that is merely a link in the overall production. As such, we do not find that the scrap Nur provided to Kaptan Demir is "merely a link in the overall production chain." . . .
>
> Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies. . . .
>
> To summarize, according to the facts present on the record of this proceeding, we find that: (1) Nur produced the steel scrap; (2) the steel scrap Nur produced could be, and was, used in the production of downstream steel products including subject merchandise; (3) Kaptan Demir was the primary, and exclusive, user of the inputs produced by Nur; (4) the steel scrap provided by Nur is not merely a link in the overall production chain, but is, instead, a common input that is used in a wide variety of products and industries; and (5) Nur's primary business activity in shipbuilding does not indicate that Nur's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that any subsidy provided to the company would "benefit the production of both the input and downstream products." Based on our analysis of all these factors, we find that the steel scrap Nur provided to Kaptan Demir is not primarily

>dedicated to Kaptan Demir's production of downstream steel product, including rebar.

Kaptan I Remand Results at 32.

On September 22, 2023, the Government filed comments in that proceeding defending Commerce's new decision:

>As Commerce explained, Nur's production process in shipbuilding is far removed from Kaptan's downstream product of rebar and involves a much higher-value product than the products Kaptan produces as a part of its downstream production. *Id.* at 19, 30-31. This, combined with the extremely limited nature of the transactions between Nur and Kaptan during the period of review, and the context of Nur's primary business activity as a shipbuilder, supports Commerce's conclusion that Nur's production is not "dedicated almost exclusively to the production of a higher value-added product" such that the purpose of any subsidy provided to the company would be to "benefit the production of both the input and downstream products. . . .
>
>The *Preamble* supports Commerce's decision to look at Nur's entire production process, rather than simply the nature of the input. Moreover, RTAC's argument that Commerce must somehow analyze the production of the input—steel scrap—separately from Nur's production of ships would, bizarrely, require Commerce to treat one production process as two separate processes, given that the scrap is created through Nur's shipbuilding process. *See* Remand Results at 19. Without Nur's shipbuilding activities, there would be no scrap; accordingly, Commerce cannot merely remove the "production of the input" from Nur's shipbuilding production process.

Government Remand Comments at 13-14.

**3.      Why *Kaptan II* Should Be Paused Pending a Resolution of *Kaptan I***

Now that Commerce has reversed its decision in *Kaptan I,* there are several reasons why this proceeding should be put on hold pending a resolution of that case. First, as noted above, a majority of the claims in this case and *Kaptan II* are the same with the identical primary claim: Nur's cross-ownership input supplier status.

4

Second, the facts upon which the Nur cross-ownership issue is based in each proceeding are substantially similar. Upon review of the record of the *Kaptan II* proceeding, we have not identified any record facts that would trigger a different determination in this case regarding Nur's relationship with Kaptan.  In both proceedings, the number of transactions was extremely limited and there is only a small difference in quantities/values.  Most importantly, in both proceedings, Nur's business activities were the same – Nur's primary business activity was shipbuilding.

Third, equally as important to the facts being similar is the fact that Commerce's original cross-ownership analysis of Nur was identical in both of the challenged underlying reviews.  In each instance, Commerce relied heavily on the fact that Nur sold all of its scrap to Kaptan and rejected Kaptan's argument that the Nur's business activities were relevant – "we disagree that the supplying affiliated company's primary business activity is a determinative factor in this case, or even in most cases." *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019*, 87 Fed. Reg. 21,640 (Apr. 12, 2022), and accompany IDM at Cmt. 1.  In the *Kaptan I* Remand Results, Commerce has now revised and clarified the factors it considers in its cross-ownership analysis:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

*Kaptan I* Remand Results at 12-13.  These factors are the *exact same factors* that Kaptan outlined in its Reply Brief at pages 3-4 in this case and advocated for generally in its briefs in this proceeding.  In analyzing the facts in *Kaptan I* under this new analysis, Commerce found that the exclusivity of Nur's scrap sales to Kaptan was now not determinative, and that the nature of Nur's business activities was a highly important factor.  Thus, were this case to proceed without a voluntary remand by the Government or a change in position, the Government would be arguing *the exact opposite position* that it took in the *Kaptan I* Remand Results and, more importantly, be arguing for a cross-ownership analysis that it so clearly abandoned in *Kaptan I*.

Under these circumstances, it is clear that *Kaptan I* has a direct and precedential bearing on this case and that this case cannot proceed until there has been a resolution from this Court in *Kaptan I*.  Once that case is resolved, the parties can consult in this case and determine the most efficient way in which to proceed.

.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz

                                                            Jordan C. Kahn
                                                            Kavita Mohan

                                                            1201 New York Ave., NW, Suite 650
                                                           Washington, DC 20005
                                                           (202) 783-6881

Dated: November 7, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the word limitation requirement set by the Court The word count for Plaintiff's Supplemental Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 1,809, less than the 2,500 word limit.

                                                    */s/ Andrew T. Schutz*
                                                  Andrew T. Schutz

                                                  *Plaintiff Kaptan Demir Celik*
                                                  *Endustrisi ve Ticaret A.S.*

Dated: November 7, 2023