C-489-819
Remand
Court No. 22-00149
POR: 01/01/2019 – 12/31/2019
**~~Business Proprietary Document~~**
**Public Version**
E&C/OI:  Team

***Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States***
**Court No. 22-00149 (CIT February 12, 2026)**
**Steel Concrete Reinforcing Bar from the Republic of Türkiye**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court

or CIT) in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Consol. Court No. 22-

00149 (February 12, 2026) (*Remand Order*).[1]  These final results of redetermination concern the

*Final Results* of the administrative review of the countervailing duty (CVD) order on steel

concrete reinforcing bar (rebar) from the Republic of Türkiye (Türkiye).[2]  In the *Remand Order*,

the Court granted Commerce's request for a voluntary remand to reopen the review and gather

more information regarding Commerce's finding that Kaptan Demir Celik Endustrisi ve Ticaret

A.S.'s (Kaptan) affiliate Nur Gemcilik A.S. (Nur) is a cross-owned input supplier within the

meaning of 19 CFR 351.525(b)(6)(iv).

In the *Remand Order*, the Court granted Commerce's request for a voluntary remand for

Commerce to reconsider its finding that Nur was a cross-owned input suppliers of steel scrap

deemed to be primarily dedicated to downstream steel production during the period of review

---

[1] *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Consol. Court No. 22-00149 (February 12, 2026) (*Remand Order*).
[2] *See Steel Concrete Reinforcing Bar from the Republic of Türkiye: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019*, 87 FR 21640 (April 12, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

(POR), January 1, 2019, through December 31, 2019.  Commerce noted that this may include the solicitation of additional information from parties and a re-analysis of record information. Regarding Nur, we determine that it was a cross-owned input supplier of steel scrap primarily dedicated to downstream steel production.  As such, we are making no changes following our reexamination of this issue.

## II.    BACKGROUND

On January 6, 2021, Commerce initiated an administrative review of rebar from Türkiye for 24 producers and exporters of subject merchandise for the POR.[3]  On February 25, 2021, Commerce selected Kaptan and Colakoglu Metalurji A.S. (collectively, Colakoglu) as the mandatory respondents in the administrative review.[4]  On March 8, 2021, Commerce released the initial CVD questionnaire to the Government of Türkiye (GOT) and informed the GOT that it was responsible for forwarding it to the mandatory respondents.  Between March and April 2021, Kaptan timely filed its affiliation response and supplemental affiliation response.[5]

In the Kaptan AFFR, Kaptan explained that while it did not believe that Nur, Martas Marmara Ereglisi Liman Tesisleri A.S. (Martas), Aset Madencilik A.S. (Aset), and Kaptan Geri Donusum Teknolojileri Tic. A.S. (Geri Donusum) qualified as cross-owned input suppliers, it was prepared to submit full questionnaire responses on behalf of these companies.[6]  Kaptan also explained that it was a privately owned corporation and the parent company of a group of companies whose business operations included, but were not limited to, "steel manufacturing, steel trading, ocean and inland transport, construction, shipping agency, seaport operations…"[7] Within this corporate grouping, Kaptan claimed that it was the sole producer and exporter of the

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 511 (January 6, 2021).
[4] *See* Memorandum, "Respondent Selection," dated February 25, 2021.
[5] *See* Kaptan's Letter, "Affiliation Response," dated March 30, 2021 (Kaptan AFFR); *see also* Kaptan's Letter, "Supplemental Affiliation Response," dated April 22, 2021 (Kaptan AFF SQR).
[6] *See* Kaptan AFFR at 2.
[7] *Id.* at 4 and Exhibit 1.

2

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

subject merchandise.[8]  Finally, Kaptan specified that all group companies were owned by members of the Cebi family or by companies owned by Cebi family members.[9]

Regarding steel scrap, Kaptan informed Commerce that it purchased a small portion of steel scrap generated by each of its four affiliates, including Nur, during the POR.[10]  Because Nur and the other three affiliates sold a relatively small amount of steel scrap to Kaptan during the POR, Kaptan requested that Commerce confirm that it did not need to provide questionnaire responses for these affiliates.[11]  As part of its request, Kaptan explained that the four affiliate companies each had separate and distinct operations, noting that Nur is a ship builder, Martas is a port operator, Aset is a coal supplier, and Geri Donusum is a plastic supplier.  Kaptan stated that the small amount of steel scrap provided by these affiliates was a by-product of their operations, which were unrelated to the subject merchandise or steel production.[12]

On April 1, 2021, the Rebar Trade Action Coalition (the petitioner) submitted comments regarding Kaptan's AFFR.[13]  In its comments, the petitioner argued that Nur, Martas, Aset, Geri Donusum, should provide a full questionnaire response because there is no threshold for the amount of an input supplied by a cross-owned input supplier to meet the attribution standard.[14]  Kaptan timely filed initial and supplemental questionnaire responses for itself and Nur, Martas, Aset and Geri Donusum.[15]

---

[8] *Id.* at 4-5.
[9] *Id.* at 4.
[10] *Id.* at 8.
[11] *Id.* at 9.
[12] *Id.* at 8.
[13] *See* Petitioner's Letter, "Comments on Kaptan's Affiliation Response," dated April 1, 2021 (Petitioner's Affiliation Comments).
[14] *Id.* at 2-5.
[15] *See* Kaptan's Letter, "Initial Questionnaire Response," dated May 6, 2021 (Kaptan IQR); *see also* Kaptan's Letter, "Supplemental Questionnaire Response," dated July 21, 2021 (Kaptan SQR).

3

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

We issued the *Preliminary Results* on November 30, 2021, where we found that Nur was an affiliated cross-owned input supplier of steel scrap to Kaptan.[16]  As such, we attributed subsidies received by Nur to Kaptan based on the following findings:  (1) the production of scrap is primarily dedicated to the production of the downstream product in accordance with 19 CFR 351.525(b)(6)(iv); and (2) Nur sold of scrap to Kaptan for production of downstream product, including rebar, it satisfied the attribution criteria under 19 CFR 351.525(b)(6)(i) and (iv).[17]

In its January 13, 2022 case brief, Kaptan requested that Commerce determine that Nur is not a cross-owned primarily dedicated input supplier per 19 CFR 351.525(b)(6)(iv) in the final results, because there was no evidence that Nur's scrap could be deemed to be primarily dedicated to Kaptan's downstream production.[18]  Kaptan argued that Commerce must:  (1) evaluate cross-ownership on a case-by-case basis depending on the particular input, the downstream product, and the production process; (2) consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in the case; and (3) determine whether it is "reasonable" to conclude that the purpose of the subsidy to that company would have been to benefit the production of the downstream product.[19]

In its January 19, 2022 rebuttal brief, the petitioner argued that Commerce should continue to find that Nur's production of scrap was primarily dedicated to Kaptan's production of the downstream product per 19 CFR 351.525(b)(6)(iv) because Kaptan's claim was not consistent with the *Preamble* and Commerce's practice in prior reviews of this proceeding and

---

[16] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2019*, 86 FR 231 (December 6, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 8.
[17] *Id.*
[18] *See* Kaptan's Brief, "Case Brief," dated January 13, 2022 (Kaptan's Case Brief).
[19] *Id.*

4

other proceedings.[20]  Further, the petitioner reiterated that there is no *de minimis* standard in terms of determining whether an input is primarily dedicated.[21]

Commerce published its *Final Results* on April 12, 2022, wherein Commerce continued to find that Nur was Kaptan Demir's cross-owned input supplier for the POR under 19 CFR 351.525(b)(6)(iv).[22]  Commerce explained that Nur and Kaptan were cross-owned entities and that Nur supplied Kaptan with steel scrap used as an primarily dedicated input product into Kaptan's downstream steel production during the POR.[23]  Commerce stated that in previous segments of the proceeding, we had considered scrap to be a type of input that was primarily dedicated to the production of the downstream steel production, regardless of the amount of scrap purchased from a cross-owned company.[24]  The CIT affirmed this decision in upholding the final results of the 2016 administrative review, finding that Commerce was not required to look at the quantity of scrap provided to a downstream producer in determining whether that producer was a cross-owned input supplier.[25]  In the prior two administrative reviews, Commerce again found that the production of scrap is primarily dedicated to the production of the downstream product in accordance with 19 CFR 351.525(b)(6)(iv).[26]  Accordingly, in the *Final Results*, Commerce found that Nur's production of scrap was primarily dedicated to Kaptan's downstream steel production in accordance with 19 CFR 351.525(b)(6)(iv), making Nur a cross-owned primarily dedicated input supplier of Kaptan.[27]

---

[20] *See* Petitioner's Brief, "Rebuttal Brief," dated January 22, 2022 (Petitioner's Rebuttal Brief).
[21] *Id*. at 5.
[22] *See Final Results* IDM at Comment 1.
[23] *Id.*
[24] *Id*.
[25] *See Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F.Supp.3d 1345, 1364 (CIT 2021) (*Icdas*) ("While the final quantity may be low, the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer.").
[26] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 FR 42353 (July 14, 2020) (*Rebar from Türkiye AR 2017*), and accompanying IDM; *see also Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 FR 53279 (September 27, 2021) (*Rebar from Türkiye AR 2018*), and accompanying IDM at Comment 5.
[27] *See Rebar from Türkiye AR 2018* IDM at Comment 5.

Kaptan challenged Commerce's finding at the CIT, but the case was stayed pending the outcome of litigation in the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stemming from the 2018 administrative review.[28]  In *Rebar from Türkiye AR 2018*, Commerce had also found Nur to be a cross-owned input supplier.[29]  On remand, Commerce reversed its findings in the 2018 administrative review that Nur was a cross-owned input supplier.[30]  The CIT sustained Commerce's finding on remand that Nur is not a cross-owned primarily dedicated input supplier, which was affirmed by the Federal Circuit.[31]

Pursuant to the *Remand Order*, on February 23, 2026, Commerce issued a supplemental questionnaire to request additional information regarding Kaptan and Nur's business activities and the steel scrap Nur provided to Kaptan during the 2019 POR.[32]  Specifically, Commerce asked Kaptan to explain if it had tolling agreements with Nur or any of its other affiliates.[33]  In its supplemental response, Kaptan explained that it had a rebar toll production contract with Nur during the POR, pursuant to which Nur provided Kaptan with steel scrap.  Kaptan then sent the rebar back to Nur, which assisted in selling it domestically.[34]

On March 11, 2026, Commerce issued a second supplemental questionnaire requesting the amount of steel scrap that Nur purchased and generated and for Kaptan to substantiate its claim that only scrap supplied by unaffiliated companies to Nur was used to produce rebar subject to the tolling agreements.[35]  In its second supplemental response, Kaptan explained that the steel scrap was subsequently used to produce downstream product, including subject

---

[28] *See Kaptan Demir Celik Endustrisi ve Ticaret A.S., et al. v. United States, et al.*, 159 F.4th 1334 (Fed. Cir. 2025) (*Kaptan Fed. Cir.*).

[29] *See Rebar from Türkiye AR 2018* IDM at Comment 5.

[30] *See Final Results of Redetermination Pursuant to Court Record*, *Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Court No. 21-00565, Slip Op. 23-62 (CIT April 26, 2023), dated July 24, 2023 (*2018 Remand Redetermination*), available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.

[31] *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 666 F.Supp.3d 1334 (CIT 2023); *see also Kaptan Fed. Cir*.

[32] *See* Commerce's Letter, "Supplemental Questionnaire," dated February 23, 2026.

[33] *Id.*

[34] *See* Kaptan's Letter, "Remand Supplemental Questionnaire Response," dated March 6, 2026 (Remand SQR1).

[35] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated March 11,2026.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

merchandise.[36]  Kaptan also explained that it was unable to track the steel scrap generated by

Nur and subsequently sold to Kaptan through production.[37]  However, Kaptan reiterated that

Nur's generated steel scrap was not used to produce rebar pursuant to the tolling arrangement.[38]

## III.    REMAND OPINION AND ORDER

In the *Remand Order*, the Court granted Commerce's request for a voluntary remand to

reopen the review and gather more information regarding Commerce's finding that Kaptan's

affiliate Nur was a cross-owned input supplier whose production of the input (*i.e.*, steel scrap) is

"primarily dedicated" to downstream products pursuant to 19 CFR 351.525(b)(6)(iv).  As

ordered, we requested and received further information regarding Kaptan and Nur's tolling

arrangement and Nur's provision of steel scrap.  Upon further consideration, we continue to find

that Nur is a cross-owned input supplier because Nur supplied steel scrap to Kaptan that it

produced and procured based on its [                              ] with Kaptan.

## IV.    ANALYSIS

### A.  Commerce's Determination Regarding Nur

Based on our regulations, *Preamble*, case precedent, and the record of this proceeding,

we find that Nur is a cross-owned input supplier whose production of an input is primarily

dedicated to the production of downstream product.  In the *Final Results*, Commerce evaluated

whether Nur was a cross-owned input supplier, pursuant to 19 CFR 351.525(b)(6)(iv).  This

regulation states: "if there is cross-ownership between an input supplier and a downstream

producer, and production of the input product is primarily dedicated to production of the

downstream product, the Secretary will attribute subsidies received by the input producer to the

---

[36] *See* Kaptan's Letter, "Remand Second Supplemental Questionnaire Response," dated March 23, 2026 (Remand SQR2 at 2 and Exhibits 2-2.1 and 2-2.2.
[37] *See* SQR2 at 2.
[38] *Id.*

7

combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)."[39]

In addition to our regulations, our determinations regarding this attribution provision have always been guided by the *Preamble*, which states that Commerce developed regulations to countervail subsidies provided to cross-owned input suppliers to mainly address situations "where a subsidy is provided to an input supplier whose production is dedicated almost exclusively to the production of a higher-value added product – the type of input product that is merely a link in the overall production chain."[40] The *Preamble* provides two examples that qualify as input supplier relationships with downstream suppliers for the purposes of attribution: (1) stumpage subsidies on timber that is used in lumber production; and (2) subsidies to semolina primarily dedicated to pasta production.[41] The *Preamble* explains that in these situations, "the purpose of "a subsidy provided to the input producer is to benefit the production of both the input and downstream products."[42]

In the *Preamble*, Commerce also provided examples of input products that are not primarily dedicated to the downstream product.[43] These inputs included generic or common inputs *e.g.*, the use of plastics in automobiles or appliances.[44] In such instances, we explained that "it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product."[45]

As the neither the *Preamble* nor the statute and regulations offer an explicit definition of "primarily dedicated," the determination is conducted on a case-by-case basis after evaluating

---

[39] We note that during the pendency of this proceeding, 19 CFR 351.525(b)(6)(iv) has been updated. However, we continue to apply the regulation as it stood when Commerce decided the *Final Results* at issue here.
[40] *See Preamble*, 63 FR at 65401.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*

8

the facts of each proceeding.  In making our determination, however, we are guided by the following criteria based on our experiences evaluating input suppliers and producers.  These include whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, and whether the input is a common input among a wide variety of products and industries, as plastics are to automobiles, and thus, not the type of input that is merely a link in the overall production.

Further, in *Coated Free Sheet from China*, in deciding whether the company HJP Pulp was a cross-owned input supplier, we explained that:

> Section 351.525(b)(6)(iv) of our regulations addresses situations where cross-owned suppliers receive subsidies and directs that those subsidies be attributed to the combined sales of the input and downstream products, as long as the input product is primarily dedicated to the production of the downstream product.  There does not appear to be any dispute in this case that pulp is primarily dedicated to the production of paper…[46]
>
> In general, {Commerce} does not trace subsidies…[47] Whether a producer uses a particular input is usually driven by business considerations.  For example, a producer may choose different inputs based on the demands of different customers.  Also, government regulations may make it more or less costly to use certain inputs depending on where the product is to be sold.  In such situations, it is perfectly rational for the producer to create a business model that takes these factors into account.  However, these business choices should not dictate how {Commerce} attributes subsidies bestowed on the inputs.[48]

As result, one factor we also consider is whether the input could be used in the production of downstream products, regardless of whether the input was used in production of subject merchandise.

We also considered prior cases where we evaluated whether the downstream producers in the overall production chain are the primary users of the inputs supplied or produced by the

---

[46] *See Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) (*Coated Free Sheet from China*), and accompanying IDM at Comment 18.

[47] *Id*. (citing *Preamble*, 63 FR at 65403; and *Final Results and Partial Recission of Countervailing Duty Expedited Reviews: Certain Softwood Lumber Products from Canada*, 67 FR 67388 (November 5, 2002), and accompanying IDM at Comment 8).

[48] *See Coated Free Sheet from China* IDM at Comment 18.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

input supplier and whether the inputs provided by the input supplier are exclusively for the overall production chain.[49]  For example, in *Lined Paper from Indonesia*, we found that "pulp logs are used to make pulp which, in turn, is used to make paper{,}" and, as such, the logs harvested and sold to the pulp producers are primarily dedicated to the production of pulp and to the downstream product, lined-paper.[50]

As a final criteria, we examined a company's business activities in previous cases to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* or if the purpose of any subsidy provided to the input producer would be "to benefit the production of both the input and downstream products."[51]  Specifically, in *Glass Containers from China*, we determined that glass machinery provided by a company was not a primarily dedicated input because the company's business license included a variety of production activities unrelated to glass equipment manufacturing.  As such, we determined that the input producer's production was not dedicated almost exclusively to the production of a higher value-added product as suggested by the *Preamble*.[52]

For the purposes of this remand, we have examined the facts on the record with a consideration of the factors, which include:

- Whether an input supplier produced the input;

---

[49] *See Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Certain Lined Paper Products from Indonesia*, 71 FR 47174 (August 16, 2006) (*Lined Paper from Indonesia*), and accompanying IDM at Comment 3.

[50] *Id*.

[51] *See Preamble*, 63 FR at 65401.

[52] *See Certain Glass Containers from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 85 FR 31141 (May 22, 2020) (*Glass Containers from China*), and accompanying IDM at Comment 12; *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020), and accompanying IDM at Comment 14.

10

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand   Court No. 22-00149

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

These factors are not in hierarchical order, but rather provide a general outline of our considerations in our examination of the record to determine whether Nur's inputs or production processes are primarily dedicated to the production of downstream product. These criteria are also not exhaustive or exclusive, and that any analysis of whether an input is primarily dedicated is established by all the facts on the record.

When assessing these criteria and the record, we are guided by our regulations and the *Preamble*. We are also guided by past Court decisions and more recent decisions regarding

11

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

whether Nur is a cross-owned input supplier.  Specifically, the *2018 Remand Redetermination* Federal Circuit opinion, and the *2021 AR Final Results*.[53]

In *Kaptan Fed. Cir.*, the Federal Circuit upheld Commerce's finding in the *2018 Remand Redetermination* that Nur was not a cross-owned input supplier of steel scrap.  According to the Federal Circuit, Commerce properly found that unprocessed steel scrap was a common input used in a variety of industries and that Nur's business activities (*i.e.*, shipbuilding) were not dedicated almost exclusively to the production of a higher value-added product.[54]  Regarding the unprocessed nature of steel scrap, the Federal Circuit explained that "the extent to which an input is generated or processed for downstream products is relevant when determining whether an input is a mere link in the production chain."[55]  Specifically, the Court found Commerce's explanation that the more an input supplier does to prepare the input for downstream production, the stronger the case becomes to find it primarily dedicated to a certain type of production was reasonable.[56]  With respect to Nur's business activities as a shipbuilder, the Federal Circuit stated that consideration of the input supplier's business activities is important in evaluating whether subsidies provided to the input supplier are intended to benefit production of downstream product.[57]  In that case, the Federal Circuit agreed that shipbuilding activities were sufficiently removed from Kaptan's downstream production, and, as such, could not benefit almost exclusively the production of a higher-value added product.[58]  Following these considerations, the Federal Circuit agreed that Nur's provision of steel scrap was not primarily dedicated during the POR.

---

[53] *See Kaptan Fed. Cir.,* 159 F.4th at 1344.
[54] *Id.* at 1344.
[55] *Id*. at 1342.
[56] *Id*.
[57] *Id*. at 1344.
[58] *Id*.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Further, Commerce determined that Nur was a primarily dedicated input supplier in the *2021 AR Final Results*.[59]  In that review, we found that Nur produced steel scrap that was then sold to Kaptan, that the scrap was used in the production of subject rebar, and that Kaptan served as the exclusive user of the scrap provided by Nur.[60]  Following the completion of the *2021 AR Final Results*, no party disputed this determination.

Nur's Provision of Steel Scrap

For the purposes of these draft results of redetermination, we have also considered the five factors listed above, the facts on the record, *Kaptan Fed. Cir.*, and the *2018 Remand Redetermination*.  Our evaluation continues to support finding that Nur's steel scrap was primarily dedicated to Kaptan's downstream production.  First, Nur produced and supplied steel scrap sold to Kaptan.[61]  Second, the steel scrap supplied by Nur was used by Kaptan in production of the downstream product, including subject rebar.[62]  Third, Kaptan, by virtue of the tolling agreements, was the exclusive user of the scrap produced and procured by Nur.[63]

Regarding the final two criteria (*i.e.*, "whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain"; and "examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products"), we find that these factors also weigh in favor of finding Nur's provision of steel scrap to be

---

[59] *See Steel Concrete Reinforcing Bar from the Republic of Türkiye:  Final Results of Countervailing Duty Administrative Review; 2021* (May 1, 2024) (*2021 AR Final Results*), and accompanying IDM at Comment 1.
[60] *Id.*
[61] *See*, *e.g.*, Remand SQR 1 at 1-2.
[62] *See*, *e.g.*, Remand SQR 2 at 1-2.
[63] *See*, *e.g.*, Remand SQR 1 at Exhibit R-1.

13

Barcode: 4920395-01 C-489-819 REM - Remand   Court No. 22-00149

primarily dedicated.  We examined all facts on the record, including evidence regarding the rebar

tolling production agreements as submitted in the course of this remand proceeding.  Regarding

the rebar tolling production agreements, Commerce finds that through this arrangement, Nur

[

].

The rebar tolling production agreements specify that Nur:  (1) [

], (2) [

], (3) [

], (4) [

], and (5) [

].[64]  The rebar tolling production contracts in effect during the POR thus demonstrate

Nur's involvement in [            ] providing steel scrap for rebar production, [

].[65]  As a result, we find that through the rebar production tolling

agreements, Nur's provision of steel scrap, whether produced by itself or procured from

unaffiliated parties, is primarily dedicated almost exclusively to the production of rebar.  Further,

we also find that Nur's steel scrap is primarily dedicated in the manner explained by the Federal

---

[64] *See* Remand SQR1 at Exhibit R-1.
[65] *Id.* at 2 and Exhibit R-1.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Circuit because Nur's direct involvement in Kaptan's production of rebar demonstrates the extent to which its provision of scrap is primarily dedicated to downstream production.

In Remand SQR1 and SQR2, Kaptan made the following claims regarding Nur's provision of steel scrap:  (1) Nur generated [

] provided to Kaptan for downstream production, and (2) the rebar produced under the tolling arrangement with Kaptan was only from steel scrap acquired from unaffiliated third parties.[66]  With respect to the first claim, Commerce has routinely explained that there is no *de minimis* standard when examining cross-ownership or attribution of subsidies.  The Court upheld the final results of the 2016 administrative review of rebar from Türkiye, where it found that Commerce is not required to look to the quantity of scrap provided to a downstream producer.[67]  Further, in this review, while Nur generated some scrap through its own operations, to [

] of steel scrap (*i.e.*, [                ]) from unaffiliated parties.  As such, this is a scenario that demonstrates why Commerce does not consider the amount of an input provided in evaluating the attribution of subsidies.  Specifically, in this instance, Nur's [


].  As a result, Nur [                                            ] of steel scrap from third parties.  It is not the volume of scrap provided that is significant to Commerce's analysis, but the nature of the production and ultimate supply of the scrap to the downstream producer.  Here, Nur both produced scrap and acquired additional scrap from other scrap producers to [                                    ] and was [

] production of rebar.  This [                ] production

---

[66] *Id.* at 1; and Remand SQR2 at 1-3.
[67] *See Icdas*, 498 F.Supp.3d at 1364 (CIT 2021) ("While the final quantity may be low, the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer.").

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

process supports a finding that Nur's provision of scrap serves as merely a link in Kaptan's overall production of downstream products.

In addition, we disagree with Kaptan's claim that the tolling contract only involved steel scrap acquired from unaffiliated companies.[68]  Specifically, there is [



].[69]  Further, Kaptan's claim regarding booking steel scrap acquired from unaffiliated parties and steel scrap generated by Nur in different accounts does not demonstrate that some steel scrap is used in tolling, while other steel scrap is not.[70]  Rather, this only demonstrates differences in how the steel scrap is acquired and booked in Nur/Kaptan's accounting systems (*i.e.*, through Nur's production as Kaptan's inventory or as a purchase Nur makes from a third party).[71]

In terms of the final criteria (*i.e.*, "examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product"), as explained above, we find that based on the tolling arrangement, Nur engaged in a [



].  An examination of Nur's business registration indicates that its primary business activities are primarily related to [

].[72]  The existence of the rebar production tolling arrangement demonstrates that Nur [

].  Therefore, unlike *Glass*

---

[68] *See* Remand SQR2 at 2.
[69] *See* Remand SQR1 at Exhibit R-1.
[70] *See* Remand SQR2 at 1-3 and Exhibits R2-3.1-R2-3.7.
[71] *Id.*
[72] *See* Remand SQR2 at Exhibit R2-8.

16

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand  Court No. 22-00149

*Containers from China*,[73] the record of this review demonstrates that Nur is engaged in [



].[74]  A review of

Nur's business activities therefore weighs in favor of finding that it is directly engaged in

activities almost exclusively dedicated to the production of downstream product in a manner

suggested in the *Preamble* that the purpose of subsidies received by Nur would directly benefit

Kaptan's production of rebar during the POR.

Having reviewed the record again, gathered more information on the record, and

analyzed the totality of the facts on the record, we continue to find that the steel scrap produced

and procured by Nur was primarily dedicated to the production of Kaptan Demir's downstream

steel products for the reasons specified above.  We find that each of the five factors evaluated

weight in favor of finding Nur's provision of steel scrap to Kaptan to be primarily dedicated.

Further, our analysis considered the *2018 Remand Redetermination*, the Federal Circuit's

opinion, the *2021 AR Final Results*, and other cases where we have made cross-owned input

supplier determinations.

---

[73] *See Glass Containers from China* IDM at Comment 12.
[74] *See* Remand SQR-1 at Exhibit R-1; and Remand SQR2 at Exhibit R2-8.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

## V.   INTERESTED PARTY COMMENTS

On April 16, 2026, we released our Draft Remand to interested parties.[75]  On April 24,

2026, we received comments from Kaptan and the petitioner.[76]

**Comment 1:  Commerce's Determination Regarding Nur**

*Kaptan's Comments:*

Kaptan did not provide a public, executive summary in its remand comments.  For further details
regarding its arguments, *see* Kaptan's Draft Remand Comments at 1-5.

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner.  For further
details, *see* the Petitioner's Draft Remand Comments at 1-6.

> {Commerce} should continue to determine that Nur's provision of steel scrap was
> primarily dedicated to Kaptan's downstream production and that Nur is Kaptan's
> cross-owned input supplier.  Nur generated steel scrap that it supplied to Kaptan
> during the period of review, Kaptan used steel scrap supplied by Nur to produce
> rebar, and all of the steel scrap generated by Nur was sold to Kaptan.  Furthermore,
> the overall nature of Nur's business activities with respect to its scrap
> generation/supply demonstrated that the scrap it provided to Kaptan was dedicated
> almost exclusively to the production of a higher value-added product.

**Commerce's Position:**

We continue to find that Nur is a cross-owned input supplier whose production of an

input is primarily dedicated to the production of downstream product.  As part of this analysis,

we considered the *Preamble*, prior Commerce cases involving primarily dedicated analyses, the

*2018 Remand Redetermination*, *Kaptan Fed. Cir.*, and the *2021 AR Final Results*.  Further, for

the final results of redetermination, we also analyzed arguments raised by Kaptan and the

---

[75] *See* Draft Remand.
[76] *See* Kaptan's Letter, "Comments on Draft Remand Redetermination," dated April 24, 2026 (Kaptan's Draft
Remand Comments); *see also* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to
Court Remand," dated April 24, 2026 (Petitioner's Draft Remand Comments).

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

petitioner in their comments on the draft remand.  Below, we address the points raised by Kaptan and the petitioner regarding in their comments.

In its comments, Kaptan argues that in the Draft Remand, Commerce incorrectly applied the case facts in its five factor analysis used to determine that Nur's provision of steel scrap was primarily dedicated to Kaptan's downstream production.[77]  Specifically, Kaptan takes issue with Commerce's analysis of the impact of Nur's tolling contract with Kaptan in finding that the last two factors satisfy Commerce's five factor primarily dedicated analysis (*i.e.*, evaluating:  (1) whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and (2) examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products.").  According to Kaptan, the steel scrap provided through the tolling arrangement was not produced or generated by Nur.[78]  As such, it cannot be found to be primarily dedicated pursuant to 19 CFR 351.525(b)(6)(iv), which focuses on the affiliate input production.[79]  To support its claim, Kaptan cites to prior Commerce decisions where Commerce explained it evaluated cross-owned input producers, not suppliers.[80]  Therefore, Kaptan explains that Commerce's analysis under 19 CFR 351.525(b)(6)(iv) should

---

[77] *See* Kaptan's Draft Remand Comments at 1-2.
[78] *Id.* at 2-3.
[79] *Id.*
[80] *See* Kaptan's Draft Remand Comments at 2-3 (citing *Light-walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 FR 67703, 67707 (November 30, 2007) (*LWRPT from China*); *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review, 2016*, 84 FR 28461 (June 19, 2019) (*HRS from Korea*), and accompanying IDM at Comment 2; and *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 FR 63875 (November 13, 2007) (*Steel Pipe from China*), and accompanying IDM at Comment 4.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

pertain only to the scrap that Nur generates, rather than the scrap it accumulates from unaffiliated suppliers.

Kaptan argues that Nur's acquisition of scrap from unaffiliated suppliers is irrelevant to whether the scrap Kaptan generates in production is primarily dedicated to Kaptan's downstream product. As support, Kaptan cites to Remand SQR1 and SQR2 where it explained that the steel scrap Nur produced was booked differently from the steel scrap it purchased from unaffiliated parties.[81] Regarding the treatment of purchased and generated steel scrap in its accounts, Kaptan argues Commerce incorrectly found that this fact had no bearing on Nur and Kaptan's tolling arrangement. According to Kaptan, tolling contracts and sales are different.[82] Under the tolling arrangement, Nur owns the scrap provided to Kaptan throughout its production into rebar.[83] As a result, this steel scrap does not enter Kaptan's accounts.

Separately, Kaptan contends that 19 CFR 351.525(b)(6)(iv) is focused on production activities, which means Commerce's analysis should be limited to the small amount of scrap that Nur generated and provided to Kaptan.[84] Further, Kaptan argues that the record demonstrates that Nur is a shipbuilder, its business activities are not dedicated almost exclusively to the production of downstream product.[85] As a result, Kaptan argues that Commerce should find that Nur is not a cross-owned input supplier of Kaptan.

In its comments, the petitioner argues that in the Draft Remand, Commerce correctly determined that Nur's provision of steel scrap was primarily dedicated to Kaptan's downstream production within the meaning of 19 CFR 351.525(b)(6)(iv).[86] According to the petitioner, Commerce's five factor analysis demonstrated that Nur's production is dedicated almost

---

[81] *Id.* at 4.
[82] *Id.*
[83] *Id.*
[84] *See* Kaptan's Draft Remand Comments at 4-5 (citing *Kaptan Fed. Cir.*, 159 F.4th at 1343-1344).
[85] *Id.* at 5.
[86] *See* Petitioner's Draft Remand Comments at 1.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

exclusively to the production of a higher value added product in a manner that benefits the

production of the input and downstream products.[87]  Further, the manner in which Nur's tolling

arrangement with Kaptan functions supports finding that Nur's steel scrap is primarily dedicated

to the production of downstream product.  Specifically, through the tolling agreement Nur

[



].[88]  These facts demonstrate that [

], Nur [                                                                    ]

demonstrating the extent to which the provision of steel scrap was dedicated to the production of

downstream product, including subject merchandise.[89]

      The petitioner also argues that Commerce correctly determined that the quantity of steel

scrap generated by Nur and provided to Kaptan for its production does not prevent it from

finding that this steel scrap was primarily dedicated to downstream production.[90]  The CIT has

determined there is no *de minimis* standard for cross-ownership or attribution of subsidies.[91]

Further, as discussed in the Draft Remand, the volume of the input is not a factor in the primarily

dedicated analysis.  Instead, the nature of Nur's production and supply of steel scrap to Kaptan

for use in production is significant.[92]

      In addition, the petitioner contends that Kaptan's claim that the steel scrap Nur supplied

(*i.e.*, not generated by itself) was only used in tolling production does not establish that Nur's

steel scrap is not primary dedicated almost exclusively to the downstream product.  According to

the petitioner, Commerce has previously found that an input need not be primarily dedicated

---

[87] *Id.* at 3 (citing Draft Remand at 11-12 and 19 CFR 351.525(b)(6)(iv)(B)).
[88] *Id*. at 3.
[89] *Id*. at 3-4.
[90] *Id*. at 4.
[91] *Id.* at 4 (citing *Icdas,* 498 F.Supp.3d at 1364).
[92] *Id.* at 4 (citing Draft Remand at 16; and Remand SQR2 at 1).

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

only to downstream product for the supplying affiliate to qualify as a cross-owned input supplier.[93]  It is also Commerce's practice to include in its calculations subsidies provided to cross-owned companies that could be used in production of downstream product.[94]  As a result, it is of no relevance whether the scrap Nur generated was not used in production of the downstream product – only whether it could have been used in production of the downstream product.[95]

The petitioner also explains that Commerce correctly noted that the production tolling arrangement [

].[96]  Kaptan was also unable to provide any evidence that the steel scrap it generated was not used in tolling production or in production of downstream product, including subject merchandise.  As Kaptan explained, it could not have the ability to trace the generated scrap to the final product.[97]  Additionally, even if Kaptan could show that the scrap generated by Nur was not used in production of rebar, Commerce may still find that Nur was a cross-owned input supplier because the steel scrap it generated could have been used in production of downstream product.[98]

Finally, the petitioner explains that Commerce correctly found that Nur's business activities were directly related to the production of downstream product in a manner that subsidies provided to Nur would benefit production of the input and the downstream product.[99]  Specifically, Nur's tolling arrangement [

---

[93] *Id.* at 4-5 (citing *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 FR 57444 (September 21, 2010) (*Seamless Pipe from China*), and accompanying IDM at Comment 21).

[94] *Id.* at 5 (citing *Supercalendered Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015) (*Supercalendered Paper from Canada*), and accompanying IDM at 160; and *Biodiesel from the Republic of Argentina:  Final Affirmative Countervailing Duty Determination*, 82 FR 53477 (November 16, 2017) (*Biodiesel from Argentina*), and accompanying IDM at 39).

[95] *Id.* at 5.

[96] *Id.* at 5 (citing Remand SQR1 at Exhibit R-1).

[97] *Id.* at 5 (citing Draft Remand at 16-17 and Remand SQR2 at 2).

[98] *Id.* at 5-6 (citing *Supercalendered Paper from Canada* IDM at 160; and *Biodiesel from Argentina* IDM at 39).

[99] *Id.* at 6 (citing Draft Remand at 17).

22

].[100]  As such, Commerce was correct in finding that Nur's provision of steel scrap was primarily dedicated to Kaptan's production of downstream product.

Regarding Kaptan's comments, we disagree that Commerce may not consider Nur's tolling arrangement or business activities as part of its five factor analysis used to determine whether Nur's provision of steel scrap was primarily dedicated to the production of downstream product under 19 CFR 351.525(b)(6)(iv).  As an initial matter, in the *2018 Remand Redetermination*, as part of our five factor analysis, we evaluated the business activities of Nur. Specifically, we explained, as part of our re-evaluation of whether Nur's provision of steel scrap was primarily dedicated, that we analyzed the scope of Nur's business activities, which was determined to only be related to shipbuilding.[101]  Given the existence of the [                    ] in this instance, we find that Nur's [

                              ], which is appropriately taken into account by the five factor analysis.

In *Glass Containers from China*, Commerce stated that an input supplier's broad business scope can serve as evidence that the input supplier's production is not "dedicated almost exclusively to the production of a higher value-added product under 19 CFR 351.525(b)(6)(iv).[102]  Moreover, as part of the analysis in *Glass Containers from China*, we examined the business license of the input supplier and explained that because the range of its business was broad, we could not find that its production was primarily dedicated such that it would meet the attribution criteria set forth in 19 CFR 351.525(b)(6)(iv).[103]  Additionally, in *Kaptan Fed. Cir.*, the Court explained that "consideration of the input supplier's  activities

---

[100] *Id*.
[101] *See 2018 Remand Redetermination* at 25-26, 28-30, and 32.
[102] *Id.* at 29; *see also Glass Containers from China* IDM at Comment 12 (emphasis added).
[103] *See Glass Containers from China* IDM at Comment 12 (emphasis added).

23

leading up to the input supplier's provision of the input to the downstream producer comports with the Preamble's stated goal of discerning subsidies intended to benefit downstream products…"[104]

If we adopted Kaptan's proposal of limiting our examination of a cross-owned input supplier's production of the input at issue, we would be unable to develop the record in a manner that enables us to conduct our five factor primarily dedicated analysis.  Specifically, factors four and five require Commerce to assess:  (1) whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and, (2) a company's business activities to determine whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products." Kaptan and the petitioner do not dispute that the five factor analysis is an appropriate framework to evaluate whether an input is primarily dedicated to downstream production.[105]

Based on these considerations and consistent with the *2018 Remand Redetermination* and *2021 AR Final Results*, we continue to find it appropriate to evaluate Nur's business activities. In this case, the scope of Nur's business activities is particularly important because Nur

[

                                        ].  In fact, Nur [

---

[104] *See Kaptan Fed. Cir.*, 159 F.4th at 1344, *citing Preamble*, 63 FR at 65401.
[105] *See* Kaptan's Draft Remand Comments at 1-2; *see also* Petitioner's Draft Remand Comments at 2-3.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand  Court No. 22-00149

].[106]

Next, Kaptan argues that since Nur did not provide steel scrap it generated as tolled steel scrap through the tolling agreement, then it is not a cross-owned input producer under 19 CFR 351.525(b)(6)(iv).  To support its argument, Kaptan cites various cases where Commerce examined cross-owned input producers, not suppliers.  We disagree with this contention for several reasons.  First, the facts of the cases referenced by Kaptan are not comparable with the facts of this case.  In *LWRPT from China*, Commerce evaluated whether a trading company that procured inputs qualified as a cross-owned input supplier.[107]  Commerce determined that it did not qualify because the trading company did not produce the inputs in question.[108]  This situation is not at issue in this proceeding because the record demonstrates that Nur produced steel scrap for use in production of downstream product, including rebar.[109]  In *HRS from Korea*, Commerce determined that the respondent had not purchased the input in question (*i.e.*, electricity) from the cross-owned input supplier during the POI.[110]  As such, Commerce explained it could not establish that the input supplier's energy was primarily dedicated to production of the downstream product.[111]  This scenario is not at issue in this remand, because the record establishes that Kaptan purchased steel scrap from Nur, and that Nur's steel scrap was used in production of the downstream product, including rebar.[112]  Finally, in *Steel Pipe from China*, Commerce explained that because the input supplier did not produce subject merchandise, we were not treating it as an input supplier under 19 CFR 351.525(b)(6)(iv).[113]  As previously

---

[106] *See* Draft Remand at 14-15 (citing Remand SQR1 at 2 and Exhibit R-1).
[107] *See LWRPT from China*, 72 FR at 67703, 67706-07.
[108] *Id*.
[109] *See, e.g.*, Remand SQR2 at 2.
[110] *See HRS from Korea* IDM at Comment 2.
[111] *Id*.
[112] *See, e.g.*, Remand SQR2 at 2.
[113] *See Steel Pipe from China* IDM at Comment 4.

25

Barcode: 4920395-01 C-489-819 REM - Remand Court No. 22-00149

explained, this situation is not applicable in this proceeding because Nur, unlike the input supplier in that case, produced steel scrap which was used in downstream product, which satisfies 19 CFR 351.525(b)(6)(iv).

Kaptan further claims that because Nur did not provide the steel scrap it produced as part of the tolling arrangement, Commerce cannot consider the relevance of this tolling agreement as part of its primarily dedicated five factor analysis.[114]  Specifically, Kaptan explains that:  (1) its generated scrap could not have been used in the tolling arrangement, (2) tolling contract sales differ from sales made absent a tolling arrangement, and (3) Kaptan's/Nur's book keeping demonstrate the difference in the manner in which tolling steel scrap and generated steel scrap were treated during the POI.[115]  We agree with Kaptan that the nature of sales made pursuant to a tolling arrangement may differ from those made absent any such agreement.  However, as explained in the Draft Remand, the record does not substantiate Kaptan's claims that Nur's generated steel scrap was not used as part of the tolling arrangement.[116]  Rather, there is [


].[117]  Further, the difference in booking between Nur's procured and generated steel scrap does not establish that produced steel scrap could not and was not used in the tolling arrangement.  It only demonstrates the difference in how an input purchase is recorded in comparison to how a self-generated input is recorded.

Notably, Kaptan explained that it was unable to trace the steel scrap produced by Nur to the final product.[118]  As such, Kaptan is unable to confirm whether the steel scrap that Nur generated was used in regular production or tolling production. Kaptan only knows that the steel

---

[114] *See, e.g.*, Kaptan's Draft Remand Comments at 3.
[115] *Id*. at 3-4.
[116] *See* Draft Remand at 16-17; Remand SQR1 at Exhibit R2-2.3, R2-3.2.
[117] *See* Remand SQR1 at Exhibit R-1.
[118] *See* Remand SQR2 at 2.

26

Barcode: 4920395-01 C-489-819 REM - Remand    Court No. 22-00149

scrap was used in production of the downstream product.  Additionally, as explained in the Draft

Remand, Nur's [

].[119]  However, as discussed above, the [

].[120]

Further, the record demonstrates that Nur's [

].[121]

For the reasons discussed above, we do not agree with Kaptan that Commerce's analysis

is limited to the small amount of scrap that Nur generated and provided directly to Kaptan.[122]

While Kaptan notes that the Federal Circuit found that Nur's shipbuilding operations were

sufficiently removed from Kaptan's downstream production such that it cannot be primarily

dedicated almost exclusively to the production of a higher value-added product,[123] the facts on

this record differ.  Specifically, as discussed, Nur [

] during

the POR, which involved the provision of steel scrap that it generated and procured.  Therefore,

we find that this [                                    ], along with the fact that Nur produced steel

---

[119] *See* Draft Remand at 16 (citing Remand SQR1 at Exhibit R-1).
[120] *Id*.
[121] *See, e.g.*, Remand SQR2 at 1.
[122] *See* Kaptan's Draft Remand Comments at 4-5.
[123] *Id.* at 5; *see also Kaptan Fed. Cir.* at 15-16.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

scrap used in downstream production during the POR, demonstrates that Nur's business

activities are [                        ] to downstream production in a manner that is dedicated

almost exclusively to the production of a higher value-added product. Regarding Kaptan's claim

that Commerce is precluded from considering the smaller amount of steel scrap that Nur

generated, we find that 19 CFR 351.525(b)(6)(iv) has no requirements regarding the amount of

an input that must be produced. Further, we agree with the petitioner that the CIT has previously

determined that the regulations do not require Commerce to measure the impact of an input

supplier's contributions as part of its primarily dedicated analysis.[124]

Finally, while the petitioner cites several cases where Commerce found an input need not

be primarily dedicated only to the downstream production of subject merchandise in order for the

affiliate to qualify as a cross-owned input supplier,[125] we find that those cases do not apply here.

In contrast to those cases, the record of this proceeding establishes that Nur's steel scrap,

whether produced or procured, was used in downstream production through the tolling

arrangement. Further, when considering the [                                    ], it is clear

that Nur qualifies as a cross-owned input supplier pursuant to 19 CFR 351.525(b)(6)(iv).

Having considered the arguments raised by Kaptan and the petitioner and evaluated the

totality of the facts on the record, we find that Nur's provision of steel scrap was primarily

dedicated to the production of Kaptan's downstream product, as discussed above. To

summarize, according to the facts present on the record of this proceeding, we find that: (1) Nur

produced the steel scrap; (2) the steel scrap Nur produced could be, and was, used in the

production of downstream steel products including subject merchandise; (3) Kaptan Demir was

the primary, and exclusive, user of the inputs produced by Nur; (4) the steel scrap provided by

---

[124] *See* Petitioner's Draft Remand Comments at 4 (citing *Icdas,* 498 F.Supp.3d at 1364).
[125] *Id.* at 4-5 (citing *Seamless Pipe from China* IDM at Comment 21; *Supercalendered Paper from Canada* IDM at 160; and *Biodiesel from Argentina* IDM at 39).

28

Nur was merely a link in the overall production chain; and (5) Nur's [

] indicates that Nur's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that any subsidy provided to the company would "benefit the production of both the input and downstream products."  Based on our five factor analysis, we find that Nur is a cross-owned input supplier and that the steel scrap it provided to Kaptan is primarily dedicated to Kaptan Demir's production of downstream steel products, including rebar.

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the *Remand Order*, we reviewed information on the record and gathered additional information necessary to determine whether Nur acted as Kaptan's cross-owned input supplier of steel scrap during the POR within the meaning of 19 CFR 351.525(b)(6)(iv).  Further, we analyzed whether steel scrap produced and procured by Nur was primarily dedicated to the production of Kaptan's downstream steel products.  For the purposes of the final results of redetermination, we are continuing to find Nur to be a cross-owned input supplier of Kaptan and that its provision of steel scrap to Kaptan was primarily dedicated to the production of downstream product, including subject merchandise.  Consistent with the *Final Results*, we are continuing to apply the total *ad valorem* subsidy rate calculated for Kaptan and its cross-owned affiliates (*i.e.*, Martas Marmara Ereglisi Liman Tesisleri A.S.; Aset Madencilik A.S.; Kaptan Is Makinalari Hurda Alim Satim Ltd. Sti.; Efesan Demir San. Ve Tic. A.S.; and Nur Gemicilik ve Tic. A.S.) of 1.75 percent, which is the same rate assigned in the *Final Results*.

Filed By: Ved Singh, Filed Date: 5/12/26 4:41 PM, Submission Status: Submitted

Barcode: 4920395-01 C-489-819 REM - Remand  Court No. 22-00149

5/11/2026

X *[signature]*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance