**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| _____x : | |
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., : : | |
| Plaintiff, : : | |
| v. : | Court No. 22-00149 |
| : | |
| UNITED STATES, : : | |
| Defendant, : : | **PUBLIC VERSION** |
| and : : | |
| REBAR TRADE ACTION COALITION, *et al.*, : : | |
| Defendant-Intervenors. : _____x | |

<u>**PLAINTIFF KAPTAN'S COMMENTS IN OPPOSITION OF COMMERCE'S REMAND REDETERMINATION**</u>

On behalf of Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), we provide these comments in opposition to of Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand") filed on May 13, 2026. As outlined below, Commerce's continued finding that Nur Gemcilik A.S. ("Nur") was a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv) for the purposes of subsidy attribution is not supported by substantial evidence.

**I.    COMMERCE'S REMAND PROCEEDING AND NEW DETERMINATION**

In this proceeding, Commerce requested a voluntary remand to re-assess whether Nur should be considered a cross-owned input supplier in light of the U.S. Court of Appeal's determination in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 159 F.4th 1334,

1341 (Fed. Cir. 2025). During the course of the remand proceeding, Commerce issued Kaptan two supplemental questionnaires seeking elaboration and clarification of the relationship between Nur and Kapan. **REM-PR 14 / REM-PR 10**. In particular, Commerce sought information regarding tolling contracts between the two companies. In the underlying review, Kaptan reported that it purchased steel scrap produced by Nur from its own production. Kaptan Affiliation Response at 5 (Mar. 30, 2021) (**PR 29/CR 6**). Kaptan also reported that it sold subject merchandise to Nur. *Id.* at Exhibit 1. In its remand questionnaires, Commerce sought information regarding these sales, inquiring whether a tolling arrangement existed. In its response, Kaptan indicated that the subject rebar was produced for Nur via a tolling arrangement and that:

> Under this arrangement, Nur provided third-party steel scrap to Kaptan Demir and Kaptan Demir produced subject merchandise and sent it back to Nur. Nur resold the rebar domestically. All of the steel scrap that Nur provided to Kaptan Demir under this tolling arrangement was scrap that Nur purchased from unaffiliated companies. None of the steel scrap was from Nur's operations.

First Remand Supp. Response at 1 (**REM-CR 12 / REM-PR 11**). Nur reported these re-sales of subject merchandise as "tolling sales" in the underlying review. Kaptan Initial Questionnaire Response at Exhibit 23 (May 6, 2021) (**PR 77/CR 42**).

In its Second Remand Supplemental Questionnaire Response, Kaptan confirmed the following:

- Nur purchased the scrap used in the tolling arrangement from unaffiliated third parties.

- Scrap produced by Nur and *sold* to Kaptan is first booked in Nur's inventory accounts and then later booked into Kaptan's inventory accounts, after ownership of the scrap is transferred via the sale. Scrap purchased from unaffiliated parties and the used in the tolling arrangement remains on Nur's books through the tolling

production as ownership is never transferred to Kaptan (*i.e.*, the scrap never becomes an asset of Kaptan).

- Scrap produced by Nur is used in Kaptan's own rebar production. Scrap procured from third parties and provided to Kaptan under the tolling arrangement is converted into rebar for Nur's own re-sales.

Second Remand Supp. Response at 1-4 (**REM-CR 11 / REM-PR** 7).

In its Remand Results, Commerce outlined the five criteria it evaluated to assess whether Nur is a cross-owned input supplier within the meaning of the regulation. Kaptan agrees that these criteria are the appropriate factors to analyze to determine whether Nur is providing an input that is primarily dedicated to Kaptan's downstream production, thereby triggering attribution. Where we disagree, however, is how the facts of this case were applied to those factors.

In analyzing these factors, Commerce assessed the impact, if any, of Nur's tolling contract with Kaptan whereby Nur provided scrap to Kaptan for conversion into rebar, which Nur then sells. Commerce found this aspect of the Nur's relationship with Kaptan to impact the last two factors in its analysis. Specifically, in its Remand Results, Commerce concluded that:

> The rebar tolling production contracts in effect during the POR thus demonstrate Nur's involvement in [          ] providing steel scrap for rebar production, [
>
>                              ]. As a result, we find that through the rebar production tolling agreements, Nur's provision of steel scrap, whether produced by itself or procured from unaffiliated parties, is primarily dedicated almost exclusively to the production of rebar.

Remand Results at 14. As outlined below, Commerce's determination is not supported by substantial evidence and is otherwise contrary to law.

3

**II.    TRADING COMPANY ACTIVITIES ARE NOT DISPOSITIVE OF WHETHER INPUT PRODUCTION IS PRIMARILY DEDICATED TO DOWNSTREAM PRODUCTION**

Nur's *purchases* of scrap from third parties do not demonstrate that the scrap the company *generates* itself is primarily dedicated to Kaptan's rebar production.  First, it is well settled that affiliated input trading companies that do not produce inputs do not satisfy the Department's cross-ownership criteria for an "input supplier" under 19 C.F.R. § 351.525(b)(6)(iv). This provision is focused on the affiliates' input production; not inputs the affiliate purchased from unaffiliated companies and then provided to the producer respondent. *See Lightwalled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 Fed. Reg. 67,703, 67,707 (Nov. 30, 2007) ("With respect to Jiaqi, this company is a trading company and does not produce any merchandise. Rather, it purchased and provided inputs to ZZPC during the period of investigation ("POI"). Because it is not an input producer, we are not treating Jiaqi as an input supplier as described in 19 CFR 351.525(b)(6)(iv) (which refers to subsidies received by the input producer)"); *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016*, 84 Fed. Reg. 28,461 (June 19, 2019), IDM at Cmt. 2 ("the record has not established that POSCO directly purchased electricity from POSCO Energy or that POSCO purchased electricity that was specifically produced by POSCO Energy. Accordingly, the claim that POSCO Energy's production of energy is primarily dedicated to POSCO's production of subject merchandise has not been established."); *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 Fed. Reg. 63,875 (Nov. 13, 2007)  ("With respect to Kingland Century, this company is a domestic trading company and does not produce any merchandise. Instead, it purchased and provided inputs to {producer of subject

merchandise} Kingland during the POI. Because it is not an input producer, we are not treating

Kingland Century as an input supplier as described in 19 CFR. 351.525(b)(6)(iv) (which refers to

subsidies received by the input producer). Instead, for the preliminary determination, we are treating

these inputs as being provided directly to Kingland."). Thus, if Nur did not sell any of its generated

scrap but only provided scrap through this tolling arrangement, section 351.525(b)(6)(iv) would not

be triggered because Nur would not be an input producer under that hypothetical.

Second, how the scrap Nur *purchases* from unaffiliated suppliers is *used* is not relevant to

whether the scrap Nur *generates* in its production is primarily dedicated to Kaptan's downstream

production. The scrap purchased by Nur is specifically used for the production of rebar under the

tolling arrangement, which is controlled by Nur. In contrast, the scrap generated by Nur from its

shipbuilding activities is not dedicated exclusively to rebar and Kaptan can use it as it wishes. *See*

*Kaptan Demir Celik Endustrisi v. Ticaret A.S.*, 159 F.4th 1334, 1341 (Fed. Cir. 2025) ("Commerce

identified multiple prior decisions involving different industries using steel scrap as an input. Further,

Commerce found that Kaptan uses steel scrap to produce a variety of articles in addition to subject

rebar, including non-subject rebar, other bars, and angle profiles."). Commerce states that "Nur's

[

                              ]." Remand Results at 16. This is not true. The tolling arrangement is an

entirely separate and distinct arrangement apart from Nur's sale of self-generated scrap. If

Commerce's statement were true, then Nur's self generated scrap would have been used in the tolling

arrangement, in addition to the purchased scrap; it clearly is not. Remand SQR1 at 1; Remand SQR2

at 1-3. The treatment of these two distinct arrangements within Nur's and Kaptan's books further

supports this fact.

Third, the fact that Nur's scrap purchases never hits Kaptan's books is relevant. Commerce

5

PUBLIC VERSION

states that "Kaptan's claim regarding booking steel scrap acquired from unaffiliated parties and steel scrap generated by Nur in different accounts does not demonstrate that some steel scrap is used in tolling, while other steel scrap is not."  Remand Results at 16.  This is wrong. It is important to understand the difference between a tolling contract and sale.  Under tolling contracts, including this one, Nur owns the scrap that is provided to Kaptan throughout the entire life cycle of the scrap into rebar; it *never* hits Kaptan's financial accounts.  In contrast, when Nur sells the scrap it generates, it leaves Nur's books and ownership is transferred to Kaptan's books.  This booking is an important demarcation between input production and the sale of that input and Nur's purchase of scrap for tolling. The receipt subsidies and attribution of benefits is typically tied to booking.

Fourth, as discussed, the focus of section 351.525(b)(6)(iv) is on production activities.  That is, it seeks to assess whether the input production of Nur is dedicated to the downstream production of Kaptan.  Thus, the relevance of business activities relates to production business activities, that other non-production business activities are [                    ][1] with Kaptan do not trigger this regulation.  As the Federal Circuit held:

> We reject RTAC's contention that the weight Commerce afforded to Nur's status as a shipbuilder was inconsistent with the *1344 regulation and Preamble. The regulation does not expressly recite the phrase "business activities," but it requires the Secretary to cross-attribute subsidies when "*production* of the input product is primarily dedicated to production of the downstream product." 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added). While the Preamble indicates that the physical relationship between the input and downstream products is a relevant and important consideration, the text of the regulation confirms that the production process yielding the input product is also relevant and important to the determination of whether input "production" is "primarily dedicated" to the downstream production. Further, consideration of the input supplier's activities leading up to the input supplier's provision of the input to the downstream producer comports with the Preamble's stated goal of discerning subsidies intended to benefit downstream products from those that are not so designed. *See* Preamble, 63 Fed. Reg. at 65401.

---

[1] Remand Results at 16.

6

*Kaptan Demir Celik Endustrisi*, 159 F.4th at 1343–44.  Commerce focus in this analysis should continue to be on the miniscule scrap sold to Kaptan and whether the business activities surrounding the generation of that scrap is primarily dedicated to Kaptan's production.  This is the "input production" the Federal Circuit focuses on and it is only through that production that section 351.525 may be triggered. Since Nur continues to be a shipbuilding and port service company, and that is the production through which section 351.525 may be triggered; its business activities do not establish that it is merely a link in the production chain.  Shipbuilding has nothing to do with the production of rebar.  As the court reiterated, "Nur's production of ships is sufficiently removed from Kaptan's Demir's production of downstream products, including rebar, such that it cannot be considered 'dedicated almost exclusively to the production of a higher value-added product.'" *Id.* at 1344.

In response to these arguments in the Remand Results, Commerce argues that Nur's trading of scrap and rebar are "secondary business activities" and therefore can be considered when evaluating the fourth and fifth criteria in its analysis, *i.e.*, "(1) whether the downstream producers in the overall production chain are primary users of the inputs **produced** by the input producer and whether the **production** of the inputs **by the input producers** is exclusively for the overall production chain; and (2) a company's business activities to determine whether an input supplier's **production** is "dedicated almost exclusively to the production of a higher value-added product." Remand Results at 23 (emphasis added).  We agree that these secondary business activities in the purchase of scrap and sale of subject merchandise can and should be considered and analyzed, we disagree however that these activities tip the scale in this instance.  Neither Nur's acquisition of scrap nor Nur's re-sale of subject merchandise produced by Kaptan has anything to do with Nur's production of the input scrap.  Moreover, the purchase of scrap from unaffiliated parties is unrelated to Nur's shipbuilding or Nur's production of *any* good. Thus, these secondary business activities

7

demonstrate that Nur's production is not primarily dedicated to Kaptan's.

Next, Commerce outlines its disagreement with Kaptan regarding the relevance of how the tolling arrangement is booked in Nur's and Kaptan's books. Remand Results at 25-26. In particular, Commerce argues that it was not substantiated whether Kaptan used scrap generated by Nur in the tolling arrangement. *Id*. The important point, however, is that there is no evidence that the scrap Nur purchased ever entered Kaptan Demir's inventory and therefore ownership was never transferred to Kaptan Demir. This simply provides one more indication that the tolling arrangement was unrelated to Nur's input production.

For these reasons, the Court should find that Nur is not a cross-owned input supplier within the meaning of the regulations, consistent with *Kaptan Demir Celik Endustrisi.*

## III.   OTHER ISSUES IN THIS LITIGATION REMAIN

In the event the Court affirms Commerce's Remand Results and Nur is considered to be cross-owned with Kaptan, there are still three outstanding issues raised in Kaptan's Complaint and Rule 56.2 Motion and brief that have yet to be decided by the Court. These include:

(1) Whether Commerce's calculation of the benefit for Kaptan's rent free land as a good for less than adequate remuneration rather than as revenue foregone was supported by substantial evidence and in accordance with the law?

(2) In calculating the benefit for the land rent program pursuant to 19 C.F.R. § 351.511, whether Commerce's selection of an industrial rent benchmark without adjusting the benchmark to remove rent attributed to buildings rather than land only, was supported by substantial evidence and in accordance with the law?

(3) Whether Commerce's finding that the program on Exemptions from Bank and Insurance Transactions Tax on Foreign Exchange Transactions countervailable was

8

PUBLIC VERSION

supported by substantial evidence and in accordance with the law?

These issues have been fully briefed and were addressed in the Court's oral argument on April 24, 2024.   These issues are therefore ripe for the Court's decision.

<div style="margin-left:50%">

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz

1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Kaptan*

</div>

Dated: June 18, 2026

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned certifies that this brief complies with the word limitation requirement provided in the Standard Chambers Procedures. The word count for Plaintiff's Remand Comments, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 2,411 words, less than the 10,000 word limit.


<u>/s/ Andrew T. Schutz</u>
Andrew T. Schutz

*Counsel for Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

Dated: June 18, 2026